IN THE MATTER OF ARTHUR DENNIS LORING
ATTORNEY-AT-LAW OF THE STATE OF NEW JERSEY.

Argued September 12, 1972—Decided March 19, 1973.

*Mr. William H. Burns, Jr.* argued the cause for Monmouth County Ethics Committee.

*Mr. Charles Frankel* argued the cause for respondent.

PER CURIAM. The Monmouth County Ethics Committee filed two presentments against respondent charging him with unethical conduct. We consider these separately, as the cases are completely unrelated.

## I. *The N. matter.*

In relation to this matter the Committee found unethical conduct in three respects: (a) respondent charged Mr. N. an "exorbitant and unconscionable" fee for representing him in the successful defense of an indictment on a criminal charge; (b) he used economic coercion in exacting from N. and his wife a note and second mortgage on their home; and (c) there was a conflict of interest in his representing the N.'s on the closing of title on sale of their home and at the same time asserting an adverse lien for his services in the criminal matter against the proceeds of the sale.

N. had been charged with criminally improper behavior with a minor girl placed in his home by the Bureau of Children's Services. In November 1969 he and his wife retained respondent, who had represented him previously in other matters, to defend the charge. The latter investigated the matter, interviewed the N.'s and certain other witnesses, arranged for N.'s arraignment and bail, prepared for trial and tried the case, which took about a day. N. was acquitted on February 23, 1970.

On November 21, 1969 respondent billed Mr. and Mrs. N. for $1,500 as a "retainer" for services performed and to be performed in the criminal matter. Shortly thereafter he

and they agreed that his fees in the case would be paid out of the proceeds of the prospective sale of their home. A mortgage on the property was then, or shortly thereafter became, in default. The Committee found that "the November 21 bill of $1,500 was intended to suggest to complainants that the legal fee would be substantial and clearly this was their expectation".

Shortly after the acquittal respondent billed the N.'s $3,500 for services in the criminal case, apparently inclusive of $400 he had paid out for investigative expenses. Mrs. N. complained that the fee was too high, but nevertheless both N.'s, as the Committee found, agreed with respondent that the fee would be paid out of the proceeds of the sale of their Englishtown home, which they had shortly before that time contracted to sell for $33,500. Respondent was retained to represent them in connection therewith. They gave him the impression they would move into an apartment after the sale but instead they contracted to purchase a substitute home in Matawan, retaining Irving J. Verosloff as attorney for that purpose.

Closing of title to the Englishtown property was set for June 1, 1970 at the Perth Amboy office of the attorney for the purchasers, Norman A. Cohen. Several days previously Mrs. N. and respondent discussed the matter of the bill, and she then said they would not pay it at the closing as they wanted to deposit the net proceeds of the sale in the bank, pay other pressing bills, and discharge the obligation to respondent out of what remained. Respondent strongly objected. As the Committee found, Mrs. N. did not reveal to respondent that they had contracted to buy another property, for which they would need a substantial deposit — funds which would have to come out of the proceeds of the sale. Nevertheless respondent learned about the proposed purchase a day or two prior to the June 1 closing date.

On June 1 respondent and the N.'s appeared at Mr. Cohen's office for the closing. Respondent handed Mr. Cohen and N. a letter-notice of claim of lien on the sale proceeds

for $3,750 ($250 for services in the real estate matter), demanding that this sum be held in escrow by Cohen pending disposition of the fee dispute. The closing was adjourned to June 4, and the dispute resolved by agreement by the N.'s to pay respondent $500 down and execute a $3,250 second mortgage on the Matawan property, payable at the rate of $60 per month. After closing of the Englishtown title respondent and the N.'s repaired to Mr. Verosloff's office where the latter prepared and the N.'s signed and delivered to respondent the note and mortgage. Verosloff was not asked by the N.'s for legal advice on the mortgage arrangement nor did he tender any. At the time of the presentment only $10 had been paid on the fee balance.

### A.  The amount of the fee.

██ In finding the $3,500 fee greatly excessive the Committee stressed the moderate earning capacity of N., a toolmaker earning about $150 net weekly at the time of respondent's engagement. However the services were substantial, involved considerable professional responsibility and were attended by a successful result. While the Disciplinary Rules enjoin that a lawyer's fee should be "reasonable" and not "excessive", DR 2–106(A), discipline is called for only if the fee charge is "so excessive as to evidence an intent to overreach [the] client"; Ibid. (D) ; In re Quinn, 25 N. J. 284 (1957). The Committee's findings in this regard do not express a finding of such intent, and, on the whole case, we do not find the circumstances to warrant discipline on the stated ground.

### B.  The assertion of the lien.

█ Putting to one side the question of respondent's conflict of interest at the closing, we conclude there is substantial doubt as to the justification for the Committee's finding of economic coercion of the N.'s by respondent in asserting a non-existent lien against the sale proceeds for

his fee in the criminal matter. There is no claimed basis for a statutory or common-law attorney's lien. However, respondent contended at the hearing that in view of the express agreement that his bill would be paid out of the proceeds of the closing he felt that "the real estate matter and the criminal matter were somewhat intertwined" and he therefore "had a right to impress a lien". While respondent has not put the matter in terms of an equitable lien there is some legal foundation for application of such a concept in these circumstances. An equitable lien is sometimes raised *"ex aequo et bono,* according to the dictates of equity and conscience, as where a contract of reimbursement could be implied at law". See *Temple v. Clinton Trust Company,* 1 *N. J.* 219, 226 (1948) ; *Rutherford Nat. Bank v. H. R. Bogle & Co.,* 114 *N. J. Eq.* 571, 573–574 (Ch. 1933).

Here there was an express agreement to pay respondent from the sale proceeds. Relying thereon, he took no action to enforce the N.'s fee obligation pending the closing, and he was not warned of the intended repudiation of the agreement until a few days before the closing. The N.'s had no other means of meeting the fee. A sufficiently arguable basis for assertion by respondent of an equitable lien for the fee claim out of the sale proceeds is made to appear to warrant our withholding imposition of discpline on respondent on the asserted ground.

## C. *Conflict of Interest.*

This aspect of the Committee's concern was posed to respondent at the hearing. He made no effort to meet it other than by a conclusional averment that he saw no conflict. However, he was representing the N.'s at the closing in relation to the sale transaction and at the same time pressing on his own behalf an adverse lien on the sale proceeds for his fee claim. We conclude there clearly was a conflict of interest and that respondent ethically should have withdrawn as the closing attorney so that the N.'s, who

respondent knew were opposed to his satisfying his fee out of the sale proceeds, would have an opportunity to be represented by independent counsel in that phase of the matter. DR 5–101(A); and see *In re Kushinsky*, 53 *N. J.* 1 (1968). The N.'s' interest in retaining at the closing the total net proceeds of the sale and respondent's interest in a claimed lien for $3,750 against such proceeds were in plain discord. It would have been impracticable and unwarrantably expensive for the N.'s to have had to be represented by two attorneys at the closing, one in relation to the sale transaction and the other in relation to the asserted lien.

## II. *The Naughton matter.*

In relation to this matter the Committee found that respondent was guilty of unprofessional conduct in (1) failing to keep a client completely and accurately informed with respect to a pending appeal he was defending for him and to advise him with relation thereto; (2) accepting a retainer from the client for the appeal but failing to respond to his inquiries as to the matter, and failing to file a brief on the appeal; and (3) deceitfully misstating to the Committee that he had filed a brief in the matter.

Respondent defended Naughton and his wife, sellers in a realty contract, in an action by the purchasers to recover a $2,300 deposit after default by the purchasers. He also brought an action on behalf of the Naughtons to recover the deposit in question from a realty concern with which the deposit money had been placed in escrow. The actions were tried together, and the Naughtons prevailed against both adversaries. However the realty concern refused to pay the judgment for the deposit because the purchasers appealed. That is the appeal here involved.

After entry of the judgment the Naughtons moved to Texas. For some unaccountable reason respondent personally advanced to them the amount of the uncollected

judgment for the deposit less his fees for services in the action (a net sum of $1,600). At the time of the hearing herein in April 1971 he had not yet collected the judgment or been reimbursed for the advance, or so he asserted, explaining that he did not know until the time of the hearing that the Appellate Division had decided the appeal (in favor of the Naughtons) on May 18, 1970.

In September 1969 the plaintiffs-purchasers in the mentioned action, represented by Kenneth Joel, filed an appeal to the Appellate Division. Respondent wrote to the Naughtons about the appeal and requested advice as to whether he was to represent them. They responded in the affirmative. On February 3, 1970, having been served that day with the appellants' brief and appendix, respondent wrote the Naughtons enclosing a copy of the documents and asking for a $500 retainer. By letter of February 24, 1970 Naughton sent respondent a check for the retainer, "earnestly" asked a number of questions concerning the options open to him in the litigation and requested advice concerning the possibility of settlement. He invited a reply by phone or wire "collect". Respondent never made any response to that letter nor communicated with the Naughtons in any way thereafter. As a result Naughton sought to induce a response from respondent through several intermediaries in New Jersey, including a county bar association president, but respondent ignored them all.

Finally, in July 1970 Naughton wrote the Committee for help and the Committee secretary sent a copy of the letter to respondent, requesting that he communicate with his client. Respondent failed to do so. After the filing of a formal complaint in the matter on October 7, 1970 respondent filed an answer purportedly explaining his failure to communicate with Naughton on the basis that the latter had not given him "the courtesy of communicating directly" with him. This of course was not true. The answer failed to explain why there had been no response to Naughton's obviously concerned letter of February 24, 1970.

Respecting the alleged failure of respondent to file an appeal brief and his representations to the Committee in relation thereto, the evidence is as follows.

On February 2, 1970 the Appellate Division ordered respondent to file a brief by February 16 but upon his showing that he had not been served with appellant's brief until February 3 he was given leave to make service and filing within 30 days after February 3 (March 5). On March 12, 1970 the Clerk of the Appellate Division wrote respondent that since he had not timely filed an answering brief he would be precluded from filing any thereafter "without permission of the court" and that the case had been placed on the oral argument list. Respondent admits receiving this notice on March 16 and never answering it or doing anything about it. An opinion was filed by the Appellate Division May 18, 1970 affirming the trial court judgment. It noted that oral argument was held May 11, 1970, that the only appearance was by Mr. Joel, for appellants, and that "respondents did not file a brief". Respondent was not notified by the court of the date of oral argument or of entry of the opinion.[1]

Respondent testified that he prepared and filed a brief in the matter. He said that "I can remember" the preparation of the brief, the research, typing and mailing of the brief on March 3, 1970. He produced a part-time secretary who recalled typing the brief after dictation from notes by respondent as well as a carbon copy of a covering enclosure letter to the court dated March 3, 1970 with notation of copy thereof to Mr. Joel. She was distinct in her recollection, however, that she did not mail the letters and brief but left them for respondent's signature and approval. A typed

---

[1]Appellate Division practice is not to notify a respondent failing to file a brief of the date of oral argument or to permit oral argument on its behalf. The practice also was, at the time here involved, not to send such a respondent a copy of the decision. This latter practice was incorrect, (*R.* 2:11–3(c)), and is no longer followed.

brief and extensive research notes on the case, as well as a purported carbon copy of the March 3 letter, were adduced in evidence by respondent.

When respondent was questioned by the Committee as to why he had not communicated with the Clerk of the Appellate Division in response to the latter's March 12, 1970 notification of default he said his own letter of enclosure of briefs probably was mailed as late as March 6, 1970, having been dated March 3 in order to evidence service within the allotted 30 day period; and, "reconstructing" the events in his mind, respondent said that he had probably assumed his letter and that of the Clerk had crossed in the mail. He was not surprised at not receiving notice of argument or a decision in the case as late as April 1971 since in his appellate experience nine to twelve months can transpire between "notice of appeal and oral argument".[2]

Mr. Joel testified that his file failed to show either a copy of respondent's purported March 3, 1970 letter of enclosure of briefs to the Court or of the brief itself and that he had no recollection of having received either.

The presentment recites that when on January 11, 1971 Mr. Burns on behalf of the Committee inquired of respondent about the status of the appeal the latter told him the appeal was still pending and that he would communicate with Naughton and send a copy of the letter to Burns. However, he never did so write to Naughton. In his answer to the complaint, filed December 4, 1970, respondent informed the Committee that "briefs have been filed and the matter is awaiting disposition by the Appellate Division".

The presentment avers that on the record before it the Committee "gives no credence" to the respondent's statements that he filed a brief with the Appellate Division and was ignorant of the decision of that court until the April

---

[2]There is never a time lag of anywhere near 13 months between filing of last brief and oral argument in the Appellate Division.

15, 1971 hearing. In this regard, Joel testified that he had no recollection whether he had spoken with respondent about the case at any time after he filed his appellants' brief in the matter. The presentment concludes that respondent "made statements to the Committee which he knew or should have known, were totally false".

As to the charge of failing to keep his client informed about the status of the appeal and to respond to the latter's inquiries in relation thereto we concur in the Committee's conclusion of unprofessional conduct by respondent. The facts in the matter, as recited above, speak for themselves. "It is as improper for a lawyer to deliberately refuse to inform a client of the status of his matter as it is to affirmatively misrepresent that status." *In re Rosenblatt*, 60 *N. J.* 505, 508 (1972). Respondent inexcusably refused to respond to reasonable requests by and on behalf of his client for information and advice about the case.

In relation to the charge of failure of respondent to file an appellate brief, we consider the determination of the Committee amply justified on the proofs. The failure of the Appellate Division clerk's office to receive the brief, if mailed, or of any return of the mailed envelopes to respondent's office if undelivered, would itself be an unlikely eventuality. But the concurrence of absence of receipt of the briefs by Mr. Joel notwithstanding the notation of such mailing on respondent's purported covering letter to the Court of March 3, 1970 renders it practically conclusive that the briefs were not mailed to either the clerk or Mr. Joel. We so find. If there was no mailing, there is a disturbing failure on respondent's part to offer any explanation therefor.

That the brief was not in fact filed does not, of course, necessarily establish willful default on respondent's part. The question we face is whether the Committee's conclusion of knowing default should be sustained on this record. If so, respondent would have knowingly misrepresented the facts to the Committee and have been guilty of deliberate

mishandling of a appeal for the proper prosecution of which he hed been paid. A determination of that degree of misconduct presents some difficulty on the instant showing.

Pointing to knowing misconduct by respondent is his failure to supply specific details concerning the time and circumstances of the mailings asserted and his failure to take heed of the warning notice of the court clerk of March 12, 1970, which was admittedly received by him March 16, and his poor excuse for not doing so. On the other hand, however, we have the fact, found by the Committee to be true, and credibly supported by the draft of brief and copious research notes admitted in evidence, that respondent actually prepared a brief at or about the time he said he mailed it for filing to the court. It is difficult to conceive of any rational motivation for respondent's going to the trouble and labor of researching the matter and actually preparing a brief yet deliberately refraining from serving and filing it. We also take into account the factor of respondent's self-interest in resisting the appeal in order to assure his reimbursement of the money advanced by him to the Naughtons which would apparently have been imperilled if the appellants won the appeal. In these circumstances, while we can understand the Committee's feeling that respondent has not been candid with it about the matter, we are constrained to give him the benefit of the doubt as to charges so serious as conscious default in filing the brief and knowing misrepresentation to the Committee.

While we will not find deliberate failure to file a brief, we conclude that respondent's whole course of conduct in relation to the handling of the appeal and his attitude toward his client merits our strong disapproval. The treatment of his client's inquiries was callous and inexcusable. His handling of the appeal was unprofessional. Had the meritorious issue in the appeal been closer, the appeal could well have been lost as a result. *Cf. In Re Samuels,* 33 *N. J.* 321 (1960); *In re Lewandowski,* 56 *N. J.* 380 (1970). The purposes of discipline are in major part the protection of the

public and the maintenance of its confidence in a trustworthy bar. See *In re Introcaso,* 26 *N. J.* 353, 360 (1958). Respondent's behavior was incompatible with those purposes.

■ The judgment of the court is: (1) that respondent refund to the Naughtons forthwith the $500 he received from them for prosecution of the appeal; and (2) that, taken together, the conflict of interest in the N. matter and the handling of the appeal in all its aspects in the Naughton matter warrant reprimand. Respondent is therefore hereby reprimanded.

*For reprimand* — Chief Justice WEINTRAUB, Justices JACOBS, PROCTOR, HALL and MOUNTAIN, and Judges CONFORD and SULLIVAN—7.

*Not guilty* — None.