577 A.2d 497

IN THE MATTER OF GERALD C. KELLY, AN
ATTORNEY AT LAW.

Argued June 7, 1990—Decided August 3, 1990.

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Justin P. Walder* argued the cause for respondent (*Walder, Sondak, Berkeley & Brogan,* attorneys; *Justin P. Walder* and *Joan A. Brogan,* on the brief).

PER CURIAM.

This case arises from a report and recommendation of the Disciplinary Review Board (DRB) that respondent be disbarred

for his conduct in the administration of the estate of Anna Baller. The attorney's problems stem in part from what might be regarded as too close a relationship between Mrs. Baller and the respondent's late law partner. That attorney (we shall call him Mr. A) had a relationship of unusual trust with Mrs. Baller. He borrowed money from her and arranged loans from her to a corporation in which he had an interest. That attorney died in 1969. Mr. Kelly, who was admitted to the bar in 1967, had done work for Mrs. Baller before Mr. A died. After Mr. A's death, respondent became Mrs. Baller's principal legal adviser. He became more than an attorney to her; he became, as had Mr. A become, a friend and confidant. Mrs. Baller was disabled, and when she had legal business, respondent went to her apartment in Asbury Park to transact it. They often spoke of their families, and Mrs. Baller became interested in the lives of the Kelly children.

That relationship continued after Mr. A's death and during the 1970s until Mrs. Baller's death in 1977. She left a will naming Mr. A's son (then a young attorney) as executor of her estate and dividing her estate (after various bequests) among her children and grandchildren. One of her sons was married to a lawyer, Margaret Baller, but that lawyer-relative had previously asked not to be named as executrix of her mother-in-law's will. After the testatrix, Mrs. Baller, died, Mr. A's son declined to serve as executor. Mr. Kelly qualified to administer the estate as alternate executor under the will.

Here arose one of respondent's problems. He was at once the executor of Anna Baller's estate and the attorney for Mr. A's estate. The problem stemmed from the fact that the principal assets in the $137,000 Baller estate were investments made to or through Mr. A:

$62,000 unsecured and past-due personal loans to Mr. A's estate, and

$35,000 loan to Costa Ice Cream Company, a business venture with which Mr. A had a relationship.

From the inception of Anna Baller's estate, respondent did not act to liquidate its assets. Rather, he chose a course (whether technically authorized for an executor or not we need not debate) that led to dissatisfaction on the part of the beneficiaries. That induced Margaret Baller to retain an attorney, who consulted with Mr. Kelly. According to Mr. Kelly, they reviewed the inheritance tax return and other documents, but when the estate had not been wound up within a four-year period, the heirs demanded a judicial accounting. The judicial accounting unraveled the details of the administration of the estate and led to the five specific complaints of misconduct that we shall review. Most of the details were revealed as a result of the investigative efforts of a court-appointed guardian *ad litem* (GAL) for the minor beneficiaries of the estate, and the family members. Together, they traced each known asset and raised exceptions to the account, which largely form the allegations of the ensuing ethical complaint.

Before reviewing the specifics of the allegations, we give a short procedural history. Following an initial complaint against respondent, a stipulation of facts was entered into between respondent and the Office of Attorney Ethics (OAE) reciting in general the matters that had become apparent in the course of the judicial accounting. The District Ethics Committee (DEC) forwarded to the DRB a report and recommendation for public discipline in which it dismissed various allegations of misconduct. The DEC found that respondent had not acted improperly by representing both the estates of Mr. A and Mrs. Baller. Also, the evidence did not support the allegation that respondent had acted improperly with regard to certain promissory notes due to Anna Baller and executed by Costa Ice Cream Company. Finally, the DEC found that respondent had had no intention of defrauding anyone when he drew a check for $4,921.67 from the Baller estate, payable to himself. The DRB referred the matter back to the DEC for a plenary hearing and, in a later ruling, clarified that even the originally-dismissed matters were to be subjects of the plenary hearing.

Without attempting to give details of each allegation, we list the five counts of the complaint:

1. That respondent altered an estate check for $4,921.67 to conceal the fact that it had been an early distribution to him of claimed commissions.

2. That he had had a conflict of interest in serving the two estates.

3. That he had taken some $1,600 in dividend checks of Mideast Aluminum Industries (MAI) (the checks) that were property of the estate without accounting for them.

4. That he had converted a $12,500 asset of the estate (Liberty Associates interest) to his own account.

5. That he had failed to invest approximately $15,000 of estate assets during the relevant years of administration and had reported non-existent certificates of deposit (CDs) to cover up the default.

Three of the allegations are admitted in fact, *i.e.*, that an estate check had been altered, that there had been an inherent conflict of interest in administering the two estates, and that there had been dividend checks of the estate not deposited to the estate account. Concerning the first allegation, respondent was candid to admit the gravity of the wrong, but pled good intentions and embarrassment for his actions as the reason why he had given the GAL an altered document. The background is that during the early stages of the estate administration respondent sought to take an advance fee for corpus commissions. He had received an investment opportunity and had drawn a check from the estate to himself for $4,921.67 and then had turned that over to Shearson, Hayden & Stone, Inc., a brokerage firm. As it turned out, the investment was oversubscribed, and within days the funds had been returned to him by the broker and redeposited in the estate account with an extra $50 to cover any loss of interest. In his accounting for the matter, respondent had shortcut the steps and had not shown the initial distribution and return of $4,921.67 to the estate.

The GAL had asked, in the course of his review, for various documents, and had received from respondent what purported to be a check for $4,921.67 to Shearson, Hayden & Stone, Inc., the broker. During the GAL's review, he noticed a discrepancy in the bank coding of certain checks, and procured the bank copies of the $4,921.67 check. Investigation showed that the check had been made payable to the attorney. On the return date of the accounting, the GAL confronted respondent with the alteration and respondent immediately admitted the wrong and pled embarrassment for having taken his commissions without court approval. Of course, he would have eventually been entitled to commissions in substantially this amount, but because a minor beneficiary was involved, our Rules of court required approval.

The conflict of interest was self-evident. As executor of the Baller estate, he had to deal with himself as attorney for the estate of Mr. A about the terms of repayment. He realizes that although he acted with the best of intentions, the situation was intolerable because of the actual conflict and the fact that he did not obtain a written waiver for the dual representation. Surely an attorney may not represent conflicting interests without receiving consent of the clients. *RPC* 1.7. The unsecured loans from the estate of Mr. A were long since past due, and adjustments in the terms of the loans had to be arranged for their interest and payment provisions. Even if consent had been obtained for the dual representation, it was just impossible to handle that situation. For example, on one occasion Mrs. A, as executrix of Mr. A's estate, made a payment on account of principal to the Anna Baller estate, but later when her cash situation weakened, the Baller estate returned $2,000 to Mrs. A. In making such decisions, respondent had to balance competing needs of the two estates that he represented.

Depositing the MAI dividend checks to his own account was also an admitted wrong on respondent's part. He can point to the fact that no harm ensued from the deposits because

he was entitled, without seeking leave of court, to take income commissions on the income earned by the estate, and his right to commissions was greater than the amount taken in the form of the MAI dividend checks. His candor, he argues, is shown by the fact that he reported one of the dividends on his accounting, thus creating an obvious disclosure of the underlying asset and the undoubted collection of other dividends. But more is required of a fiduciary than partial disclosure. An executor is required to account for each item of the estate that comes into his hands. That was not done. Respondent asserts that his use of the funds, in view of his claim of right, does not equate with an *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979) violation. It suffices to observe that he concealed the existence of estate property. Those three charges aside, there remain for disposition the two most important charges in quantitative and qualitative terms.

We address first the question of the nonexistent or fictitious CD accounts. The DEC found as a fact that respondent had misstated the existence of such accounts and that he was thus unable to account for his handling of over $15,000 in estate assets between 1977 and 1981. Once again, the GAL made an independent inquiry with regard to entries on the 1981 accounting. He was unable to confirm the existence of the various CDs shown as having been on deposit at the Central Jersey Bank and Trust Company (CJB & T). The OAE presented evidence from CJB & T that both computer and manual record searches failed to show the existence of confirmatory records. Respondent demonstrated through his firm's bookkeeper that a 1981 deposit of $18,777.31 to the law firm's trust account had come from CJB & T, thus belying the absence of a CD account before that date. In addition, a branch bank officer and respondent's secretary testified to their recollection that CDs were rolled over during that period. Evidence of the existence of the CDs was that respondent filed fiduciary-income-tax returns disclosing taxable income earned by the estate, although he did not have in his records any 1099 forms from the bank showing

that the interest income had been paid. The remaining evidence was in conflict: in the opinion of a CJB & T officer, the amounts of income shown on the accounting exceeded the amounts allowable under federal regulations; yet federal regulations were shown to be at variance with his testimony. All in all, the issue is probably one that would have never arisen but for the telltale indicia of concealment with respect to the other assets. It would have taken an extraordinarily cunning person to dummy up in advance the fiduciary-income-tax returns. No income or principal was claimed to have been lost, and no exception was allowed in the accounting on that score. As noted, the DEC found that the assets had never been invested as reported, but the DRB found that the record did not clearly and convincingly demonstrate that fact. In view of the exacting standard of clear and convincing proof required to establish attorney misconduct, and based on our independent review of the record, we agree with the DRB's conclusion on that aspect of the case.

That leaves for contest then but one issue and that, by far, the most critical aspect of the estate's administration. Among the decedent's papers, the GAL or members of the Baller family discovered the investment in Liberty Associates. They learned by communicating with the partnership that the proceeds of the partnership interest had been transferred to the benefit of the respondent. Had respondent but disclosed, even to his partners, the explanation that he later gave for this transfer, he might well have avoided the negative inferences that inevitably flow from the undisclosed transfer of that estate asset to himself. Respondent's explanation is that he acted out of concern to protect the confidences of his client. He described her, as she must have been, as a generous woman, kind to her children and grandchildren, and interested in Mr. Kelly's life and that of his family. He said that in 1973 she expressed a desire to give him, for the benefit of his family, the interest in Liberty Associates. She had, according to respondent, often made undisclosed gifts to other family members. He declined

to make the gift absolute (as by registering the transfer in 1973) because he could not rule out the possibility that she might later require the funds for needs due to age or any emergency. Thus, although he had possession of the certificate, he did not transfer the ownership on the books of the partnership in her lifetime. He believed that she would have wished to keep the gift confidential both during her life and thereafter. In explanation of his conduct, he said there had been a contemporaneous writing that had been among her papers, but following her death in 1977 no such document was found.

Respondent was held to account for that asset in the administration. He agreed to reimburse the estate in full. He testified that he did so to avoid the embarrassment of litigation and to maintain his professional standing.

What conclusions are to be drawn from this evidence? This and other matters concerning the estate were referred to the Union County Prosecutor, who turned the case over to the Office of the Attorney General, who found no probable cause to believe that a crime had been committed.

Yet the DEC concluded that the evidence clearly and convincingly showed that respondent had failed to preserve trust funds by selling the share of Liberty Associates in his fiduciary capacity, depositing the proceeds in his children's account rather than the estate account, and failing to list the asset in any of the estate accountings. The DRB also concluded that respondent had knowingly misappropriated the partnership interest to his own use. The Board rejected respondent's contention that the share had been an *inter vivos* gift from his client.

Our independent review of the record leads us to conclude, as did the DEC and DRB, that Mrs. Baller had not given the Liberty Associates interest to respondent in her lifetime. For whatever else the evidence shows, it shows that until the date of her death, decedent had retained a reversionary interest in the asset. By respondent's own admission, it was available for

her needs. After her death, only her executor could have made a disposition of the asset. The authority conferred on the executor under Anna Baller's will did not include the authority to transfer the estate asset to himself or his children. That transfer was an unauthorized disposition of estate property. *Cf. In re Iulo,* 115 *N.J.* 498, 559 *A.*2d 1349 (1989) (establishment of fourth-degree offense of knowing misuse of entrusted property of client is the equivalent of *Wilson* misappropriation).

 What discipline then should be imposed in these circumstances? The DRB made the measure of discipline dependent on the circumstance that at least some of the MAI dividend funds had been received to respondent's own use after the date of the *Wilson* decision; it thus concluded that the measure of discipline was the invariable disbarment required by the *Wilson* doctrine. Because of the size of the sums involved in relationship to the other issues and of the attorney's claim of right to the funds, we are not inclined to measure the discipline in this case by that standard. Rather, we believe the measure of discipline must flow primarily from the unauthorized disposition of the Liberty Associates interest. We realize that there are many mitigating factors in respondent's favor. He fully reimbursed the estate for all claims or losses attributable to his conduct. The A estate loans, although unsecured, were never endangered, and respondent personally guaranteed that the Baller estate would suffer no loss on account of those loans. The Costa loans were personally guaranteed by Costa's officers. Respondent paid the legal fees incurred in collecting on those notes. He also paid the fees of the GAL, waived his own fees, and paid the fees of Margaret Baller.

In addition, we recognize both that the critical act of transfer of the Liberty Associates interest occurred before our decision in *In re Wilson, supra,* 81 *N.J.* 451, 409 *A.*2d 1153 and that we are administering our discipline well over a decade after these events. We have regretted such delays in the imposition of attorney discipline and tempered sanctions in light thereof. *See*

*In re Stier*, 108 *N.J.* 455, 530 *A.*2d 786 (1987). But there is more to this case than a single instance of misconduct. Standing alone, the check alteration would warrant a long period of suspension. *See In re Weston*, 118 *N.J.* 477, 572 *A.*2d 604 (1990) (attorney who falsified closing documents and failed to disclose misconduct suspended for two years); *see also In re Lunn*, 118 *N.J.* 163, 570 *A.*2d 940 (1990) (attorney who swore falsely to matters in pending litigation suspended for three years). Add to that the conflict of interest in respondent's activities and finally the weight of the misappropriation of the Liberty Associates interest, and we have a qualitatively different case.

Lawyers were disbarred before *Wilson*. All that *Wilson* made clear is the almost invariable nature of the sanction of disbarment thereafter in cases of knowing misappropriation. To his credit, respondent has not sought to minimize the situation. In a rather revealing exchange with the two lawyer members of the DEC at the windup of the several days of hearings, he admitted that it was wrong to have left no record of the handling of the $1,600 in MAI dividends. He realized that it would be highly questionable that he should just open up the estate in March of 1977 and take a $750 income commission on income not yet earned, as he did when he deposited in his personal checking account the MAI dividend of June 10, 1977. He realized that he should have gotten a waiver for the dual representation of the two estates, and he realized that the Liberty Associates investment was "technically" an asset of the Baller estate. He pled that he sought no unauthorized pecuniary benefit from the estate, but withdrew only money that he believed he was either authorized or otherwise permitted to withdraw.

What sense of isolation drove him to the aberrant conduct in this case is far from clear. As an experienced estate attorney of ten years' standing, he surely knew that his conduct was unprofessional. Had he but consulted with partners or fellow attorneys, his path might have been altered. Had he but

disclosed to the beneficiaries of this estate the transactions that he later related, the inferences of ethical guilt might well have dissipated. Rather, he chose, due to embarrassment or perhaps an exaggerated sense of confidentiality, to deal with the affairs of the estate on a basis of subjective morality, doing what he thought best without regard to the fiduciary obligations that every executor is expected to follow.

We are mindful of the otherwise distinguished career of this attorney and of his otherwise blameless public and private life, and of his service to our country. Many have given testimony to his good reputation at the bar.

We believe, however, that the misconduct in the administration of this estate does not leave room for continued service at the bar. This was not a single aberrant, even compulsive, act, see *In re Farr*, 115 *N.J.* 231, 557 *A.*2d 1373 (1989) (public prosecutor's misuse of funds), nor even the act of an attorney perhaps shouldering more of the blame for a misuse of funds than he deserved, see *In re Infinito*, 94 *N.J.* 50, 462 *A.*2d 160 (1983). Nor, as noted, was this a case of a single, youthful act of dishonesty at the behest of a family member that permitted a community-service alternative to discipline, when the discipline was so long delayed. *See In re Stier, supra,* 108 *N.J.* 455, 530 *A.*2d 786. A pattern of misconduct permeated the administration of this estate. Although the pattern was confined to this one estate, the breach of fiduciary duty was too broad and the instances too numerous to allow for less than the most serious discipline. We have repeatedly emphasized that the purpose of attorney discipline is to sustain public confidence in the bar. *See, e.g., In re Infinito, supra,* 94 *N.J.* at 57, 462 *A.*2d 160. No aspect of a lawyer's work is more needful of confidence than the administration of estates.

Moreover, none are more needful of such confidence than are the bereaved and dependent beneficiaries of an estate, especially minor beneficiaries. It is that confidence that must be nurtured by members of the bar. We respect that respondent

may not have appreciated the loss of confidence engendered by his acts because he believed that what he did was morally right, but in certain of the instances (MAI and Liberty Associates) he acted beyond the authority of law in disposition of the estate's funds. Although it may be too late for him, there is a lesson here for all attorneys—to seek the good counsel of peers, to disclose all questions of conflict to clients. The attorney who is isolated, alone, can lose sight of that compass of ethical probity that must guide us all.

Our independent review of the record clearly convinces us of the correctness of the factual determinations made by the DRB. No issue is in dispute except perhaps the good faith of respondent with respect to the Liberty Associates interest. Even crediting respondent's good faith in that matter, no fiduciary can engage in such unauthorized transactions without severely affecting public confidence in the faithful administration of the attorney's duties to the estate. Taken in its entirety, the conduct requires disbarment.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

### ORDER

It is ORDERED that GERALD C. KELLY of WESTFIELD, who was admitted to the bar of this State in 1967, be disbarred; and it is further

ORDERED that GERALD C. KELLY reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that GERALD C. KELLY be permanently restrained and enjoined from practicing law; and it is further

ORDERED that GERALD C. KELLY comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with disbarred attorneys.

*For disbarment*—WILENTZ, C.J., and CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*Opposed*—None.