586 A.2d 237

IN THE MATTER OF PETER L. HUMEN, AN
ATTORNEY AT LAW.

Argued November 27, 1990—Decided March 1, 1991.

*William R. Wood,* Deputy Ethics Counsel, argued the cause
on behalf of Office of Attorney Ethics.

*Mark P. Denbeaux* argued the cause for respondent.

PER CURIAM.

This disciplinary proceeding arises out of a presentment filed by the District VI Ethics Committee (DEC) against respondent, Peter Humen, based on his representation of Lillian O'Connell. The DEC found respondent guilty of unethical conduct, and the Disciplinary Review Board (DRB) agreed with that finding. A majority of the DRB recommended that respondent be suspended from the practice of law for one year, two members recommended that he be suspended for two years, and one member voted to recommend disbarment. Our independent review of the record leads us to conclude that respondent has been guilty of unethical conduct. However, we think that a two-year suspension from the practice of law more appropriately reflects the seriousness of respondent's conduct.

I

Respondent first met the grievant, Lillian O'Connell, in 1965. Later, they became friendly when he attended St. Peter's College where Mrs. O'Connell was employed. Their friendship continued after respondent was admitted to the bar in 1977.

Respondent had prepared Mrs. O'Connell's husband's will. After her husband's death in 1978 Mrs. O'Connell, who had inherited a sizeable estate under the will, retained respondent to represent her. Due to their friendship and Mrs. O'Connell's lack of business sophistication, she relied primarily on respondent for advice concerning substantially all her legal and financial affairs for the next eight years (until Mrs. O'Connell filed the grievance that led to this proceeding).

Respondent's primary ethical transgressions involve his representation of Mrs. O'Connell with respect to the purchase, management, and sale of property located on Bartholdi Avenue in Jersey City (the Bartholdi property).

A. *Purchase of Bartholdi Property*

Respondent's representation of the grievant as a buyer of the Bartholdi property "was fraught with irregularities and improprieties." In 1981, allegedly "for tax purposes," respondent advised Mrs. O'Connell to purchase a two-family house on Bartholdi Avenue that was owned by respondent's friend, Thaddeus Lewandowski. Lewandowski, who was not independently represented, agreed to take back a purchase money mortgage in the amount of $28,000 on the total purchase price of $44,000.

According to respondent, Lewandowski had reservations about Mrs. O'Connell's ability to meet the mortgage payments. Because of those concerns, respondent drafted a rider to the contract of sale that provided that the deed and mortgage would not be recorded for thirty months. Respondent contended that this was done to allow Lewandowski to regain title to the property without necessitating a foreclosure action if Mrs. O'Connell defaulted on the mortgage. The effect of the rider was that there was no formal record of Mrs. O'Connell's ownership of the property.

Although respondent claims that Mrs. O'Connell was aware of the rider, we find by clear and convincing evidence that she was never shown nor advised of the rider when she signed the contract of sale. At the time of the purchase, there was no traditional closing, nor was Mrs. O'Connell given copies of any deed, mortgage, or other closing documents.

Despite the fact that respondent was aware that Lewandowski was married, he did not insist on a signature from the seller's spouse. He had no explanation of why he allowed the closing to continue without ensuring transfer of good title to his client. Indeed, no documents regarding the sale to Mrs. O'Connell were recorded until 1987.

Respondent's failure to record the deed and mortgage for a period of six years, as well as his failure to insist upon the signing of the deed by Lewandowski's spouse at the time of closing, presents a clear case of gross negligence, in violation of

*DR* 6–101(A)(1).[1]  Respondent's failure to advise Mrs. O'Connell of the existence of the rider was grossly improper.  By his action he admittedly attempted to protect the interests of a non-client friend over those of his own client.  In so doing, respondent created a conflict of interest in violation of *DR* 5–105(A) and *DR* 7–101(A)(1) and (3).

### B.  *Management of Bartholdi Property*

Humen's conduct was also unethical with respect to the management of the Bartholdi property.  For the first year after her purchase, Mrs. O'Connell managed the Bartholdi property without assistance from respondent.  The record reflects that she collected the rents and made certain disbursements during that time period.  In 1983, however, respondent induced Mrs. O'Connell to allow him to take over the management of the property.  In his "Response to Grievance," Humen stated that he took over the management because the property was losing money and because Mrs. O'Connell was late on her mortgage payments to Lewandowski.  The statements that Mrs. O'Connell was late in her mortgage payments were contradicted by Mr. Lewandowski, who testified that all the mortgage payments had been made within the time specified by the mortgage.

During the years he managed the property, respondent never formally reported or accounted to his client for the income produced by the Bartholdi property, the expenses required to maintain it, or the profit it earned.  Respondent failed to claim either a profit or a loss for the Bartholdi property on Mrs. O'Connell's income tax returns, which he prepared.  From 1982 through 1987, the only reference to the Bartholdi property on

---

[1]Effective September 10, 1984, the Rules of Professional Conduct of the American Bar Association, as modified by this Court, govern the conduct of the members of the bar of this State.  *R.* 1:14.  Respondent's actions occurred prior to and subsequent to that date, and are consequently governed by both the Disciplinary Rules and the Rules of Professional Conduct.

Mrs. O'Connell's tax returns is a 1982 claim for depreciation of the property based on fifteen-year life. That claim did not reappear in any subsequent year. Moreover, Humen made no claim for any tax deduction for interest paid on the Lewandowski mortgage, and prepared no schedule of income or expenses, as required by the tax code.

Respondent's failure to account regularly to his client concerning both the rental income earned by the Bartholdi property and the maintenance expenses incurred thereon is inexcusable. Moreover, from the client's testimony and respondent's "Response to Grievance," any limited "accounting" actually provided to the client by respondent on an informal basis was misleading: Mrs. O'Connell testified that respondent told her not only that the property did not show a profit, but also that she was obligated to respondent who was paying part of the mortgage payments on that property as well as the mortgage payments on property she owned in West Virginia. However, respondent testified before the DEC that the property was indeed making a profit, sufficient to pay not only Lewandowski's mortgage but also the mortgage on Mrs. O'Connell's West Virginia property.

Respondent's conduct with respect to the management of the Bartholdi property shows a lack of reasonable diligence, in violation of *RPC* 1.3; a failure to communicate properly with his client, in violation of *RPC* 1.4; a misrepresentation to his client of her financial situation, in violation of *RPC* 8.4(c); and a failure to safeguard his client's property, in violation of *RPC* 1.15(b).

## C. *Sale of Bartholdi Property*

Respondent's most egregious conduct with respect to the Bartholdi property was his purchase of the Bartholdi property from his client without advising her to secure independent counsel. In 1984, Humen induced Mrs. O'Connell to sell the Bartholdi property to him for $40,000—$14,000 less than the

reconstructed appraisal valuation of $54,000 and $4,000 less than she had paid for the property three years earlier. Mrs. O'Connell testified that she sold the property because based on respondent's representations she believed she was losing money on her investment. She further testified that respondent had discouraged her from seeking other buyers or contacting a realtor. Before the DEC, respondent contended that the lower price reflected the deterioration of the Jersey City neighborhood, although in fact property values were on the rise. He further contended that the *actual* purchase price was $48,000, but that he reduced the price by $8,000 to allow for fees that Mrs. O'Connell owed him.

In his initial "Response to Grievance" as well as in his formal answer, respondent stated that he had advised Mrs. O'Connell to seek independent counsel. At the DEC hearing, however, he admitted that he had never advised her to seek other counsel.

The October 9, 1984, contract for sale provided, in paragraph four, that respondent, as purchaser, was to be given credit for legal fees and payments made on the property, and was to be given further credit "for any major repairs done, being done or to be done to maintain the integrity" of the property. Additionally, in paragraph 5, respondent claimed a credit for mortgage payments made to the Barbour County Bank on the West Virginia property. As previously stated, mortgage payments on that property were covered by income from the Bartholdi property, not by funds paid by respondent.

Subsequently, an "Agreement for Sale of Real Estate" dated August 11, 1986, purported to convey the Bartholdi property to respondent for $1.00. That document further grants an "unrestricted" power of attorney to respondent, which "shall not be affected by any intervening circumstances, including death or incapacity, but shall survive to allow Peter L. Humen, Esq., the right to effect any transfer he shall so see fit."

In late 1986, prior to recording any documents regarding the sale from Lewandowski to O'Connell or from O'Connell to

Humen, respondent asked Lewandowski to sign a deed transferring the property directly to him. Lewandowski refused and retained his own attorney. Lewandowski and his wife then signed and filed an amended instrument deeding the property to O'Connell. Thereafter, a deed reflecting the transfer of the property from Mrs. O'Connell to M.L.H. Properties (respondent) was signed on May 28, 1987, and recorded on September 15, 1987.

Following the payoff of the balance of approximately $26,000 on the Lewandowski mortgage in May 1987, respondent advised Mrs. O'Connell that he would retain the nearly $14,000 remaining from the purchase price to cover his fees and monies allegedly owed to him for payments on both the Bartholdi and West Virginia properties.

In his "Response to Grievance," Humen stated that he had "incurred financial obligations" by paying the Lewandowski and West Virginia mortgages and by managing the Bartholdi property. That was untrue. In testimony before the DEC, respondent admitted that the rental income on the Bartholdi property was more than enough to cover both mortgages. Despite repeated requests, neither a formal accounting of the Bartholdi property nor a statement of services in support of fees taken by respondent was ever provided to the grievant. Admittedly, Mrs. O'Connell owed some fees to respondent, but he never submitted any bill or statement of services to her. At the hearing before the DRB, the presenter contended that "there isn't $5,000 worth of work in those files. There's little work for Lillian O'Connell. There's a lot of work for Peter Humen."

Mrs. O'Connell did not receive a penny from the sale of the Bartholdi property. Moreover, she did not receive any income from the property once respondent took over its management in 1983, despite its admitted profitability.

Both the DEC and DRB were very disturbed by respondent's production in the course of the DEC hearing of a "new"

document purporting to be an "agreement of sale" between respondent and Mrs. O'Connell. As the DRB reported the incident:

> In his initial response to the O'Connell grievance, respondent contended that he had an agreement of sale with Mrs. O'Connell as early as 1982, but was unable to locate the document. In the middle of the ethics hearings, respondent produced Exhibit C–30 in evidence, dated April 9, 1982, in which Mrs. O'Connell allegedly agreed to sell the Bartholdi Avenue property to him for $44,000. after her death, if her children had no interest in purchasing it; permitted him to manage the property and agreed further that a sum in excess of $5,000 in fees was then due to him. At hearing, Mrs. O'Connell admitted that the signature was hers, but denied ever signing the document. Her claim that respondent often had her sign documents in blank was supported by various blank documents in the record, provided by respondent and signed in blank by Mrs. O'Connell. Exhibit R–28. The Committee further considered that the document, which was typed, had only a pencil line for Mrs. O'Connell's signature, that respondent did not produce the document in compliance with discovery, and that he was unable to explain the purpose of the document. Based on these facts, the Committee concluded that the document had been fabricated by respondent after he obtained Mrs. O'Connell's signature.

Although agreeing that the evidence supported a strong suspicion that the document was not genuine, the DRB did not find sufficient evidence to establish that respondent had fabricated the document.

Respondent had a personal interest in obtaining the Bartholdi property at least as of April 1982. His interest in, and subsequent purchase of, that property placed him in an incurable conflict-of-interest situation. He was fully aware of Mrs. O'Connell's reliance on his advice and of her lack of sophistication in business matters. As soon as he broached the subject of purchasing the property, he should have insisted that Mrs. O'Connell obtain independent counsel. That he failed to do. He thereby violated *DR* 5–104(A) and 5–105(A) as well as *RPC* 1.7(b) and 1.8(a).

We find as did the DRB that

> [s]eparate violations of these rules were committed by respondent at each step of the transaction, including: the October 9, 1984 contract for sale, drafted by him; the 1986 attempt to have Lewandowski sign the deed directly over to him; the August 11, 1986 Agreement of Sale of Real Estate (Exhibit C–18 in evidence); and the May 28, 1987 deed from Mrs. O'Connell to M.L.H. Properties (the respondent).

The Board is further troubled by several aspects of this transaction. Mrs. O'Connell testified, in essence, that she believed the property to be a bad investment and therefore determined to sell it. Respondent dissuaded her from seeking other buyers or the services of a real estate broker, and subsequently purchased the property from her for $14,000 less than the reconstructed appraisal value. Exhibit C–26 in evidence. These are not the actions of an attorney looking out for his client's best interests.

The Board finds, further, that respondent's failure to provide a statement of services to Mrs. O'Connell in support of his claim for fees of approximately $14,000 allegedly due him (and counted against the purchase price after respondent's payoff of the Lewandowski Mortgage) was improper and violated *RPC* 1.5 and *RPC* 1.15(b). This failure, combined with respondent's original claims that the funds represented payoff of sums advanced by respondent to cover the Bartholdi Avenue and West Virginia mortgage, raises a strong suspicion that the claim of fees earned cannot be justified. Once more, however, the record falls short of the requisite level of proof, and neither overreaching nor misappropriation can be found.

## II

Respondent's most egregious conduct in dealing with Mrs. O'Connell involved another serious conflict of interest. In 1985, the grievant decided to purchase a home in a new development in Bricktown. She had recently sold another home, and had more than $250,000 in liquid assets. The purchase price of the Bricktown home was $93,000.

Initially, Mrs. O'Connell relied on the developer's attorney to handle all aspects of the transaction. Subsequently, however, there were construction delays, and Mrs. O'Connell was served by the developer with a "time of the essence" letter. She then sought respondent's advice. They agreed that a portion of the purchase price would be financed. Respondent told Mrs. O'Connell that he would try to find a mortgagee to lend her $40,000, but explained that this could be difficult because of her "poor financial position." Prior to closing, respondent notified Mrs. O'Connell that he had found private investors who were willing to lend her the money. Those individuals, however, wished to remain nameless. At the closing respondent arrived with $40,000 in cash. He then had Mrs. O'Connell sign a

mortgage listing the mortgagee as "Peter L. Humen, Receiver."

Mrs. O'Connell testified that she did not know that respondent was the lender. Humen claims that he fully disclosed to Mrs. O'Connell that he was the lender. He was unable, however, to explain why the mortgage referred to him as a "receiver."

Throughout this time, O'Connell maintained a money-management account with Merrill Lynch, Inc. That account contained most of her cash, as well as Public Service Group stock. After the Bricktown purchase, respondent induced O'Connell to set up a trust account with Merrill Lynch naming him as trustee. Mrs. O'Connell's Public Service Group stock was transferred to that account as additional security for the $40,000 mortgage. Each month, mortgage payments of $500.00 were transferred from the cash account to the trust account.

Respondent never withdrew money from the trust account. Mrs. O'Connell filed the grievance in this case on September 18, 1987. At the end of 1987, the trust account was closed and all payments and the stock returned to O'Connell's Merrill Lynch money-management account. Respondent received no money from that transaction. The loan and mortgage remain outstanding.

We find that respondent was involved in a serious conflict of interest with Mrs. O'Connell when he convinced her that she required a mortgage to purchase her Bricktown home, then, unbeknownst to her, provided the $40,000 in cash for that mortgage. We conclude, as did the DRB, that

respondent compounded this unethical conduct by insisting on holding her Public Service stock as security above and beyond the mortgage on the property, albeit the stock was held in an account in Mrs. O'Connell's name. Moreover, respondent later refused to renegotiate the interest rate, although rates had fallen, and did not even refer his client to a bank or other source to locate a lower rate. To the contrary, he called in the mortgage, and then told his client that the fictitious mortgagees wanted a cut on the profit realized by the stock.

The fact that the stock was not actually sold by respondent is virtually irrelevant. It is respondent's avariciousness and statements to his clients that greatly trouble this Board. It is clear that, at every step of this matter, respondent's main goal was to insure that he obtain every possible profit from this transaction. It is to avoid this very type of situation that attorneys are required to deal at arms' length with a client. Here, the problem is compounded by the fact that respondent was dealing with an elderly widow who relied on him for her financial well-being.

Respondent clearly acted deceitfully and placed himself in an obvious conflict of interest by lending $40,000 to his client without advising her that he was the mortgagee. Moreover, throughout his transactions with his client he never advised her to secure independent counsel. We conclude that respondent violated RPC 1.4(b), by failing to explain the matter sufficiently to allow his client to make an informed decision; RPC 1.8(a), by acquiring a pecuniary interest adverse to Mrs. O'Connell without advising her to seek other counsel and without obtaining her written, informed consent to the transaction; and RPC 8.4(b), by deceiving his client and misrepresenting the mortgage situation to her.

We have reviewed the record independently with respect to certain other charges filed by Mrs. O'Connell and agree with the DRB that there is insufficient clear and convincing evidence to support those charges.

### III

Based on our review of the entire record, we are satisfied by clear and convincing evidence that respondent was guilty of unethical conduct while representing Mrs. O'Connell with regard to the Bartholdi and Bricktown properties. The record demonstrates that he does not comprehend his professional obligations or understand the concept of conflict of interest. His conduct discloses an entirely unacceptable insensitivity to those basic ethical considerations.

It is well-established that "[a] lawyer is required to maintain the highest professional and ethical standards in his dealings

with clients." *In re Gavel,* 22 *N.J.* 248, 262, 125 *A.*2d 696 (1956).

It is well settled that all transactions of an attorney are subject to close scrutiny and the burden of establishing fairness and equity of the transaction rests upon the attorney.... If the burden is not satisfied, equity has regarded such transactions tainted so as to constitute a constructive fraud.... [C]ircumstances comparable to those in this case have been considered to be suggestive of imposition or overreaching giving rise to a presumption of undue influence and invalidity (citation omitted).

[*In re Gallop,* 85 *N.J.* 317, 322, 426 *A.*2d 509 (1981).]

In *Gallop,* an attorney was suspended for six months after he had negotiated, drafted and executed a deed and trust agreement for an elderly client, where the attorney was named as both trustee and beneficiary of the trust and where, despite the obvious inherent conflict of interest, that attorney failed to insure that the client had obtained independent legal advice.

We have warned attorneys repeatedly of the dangers of engaging in business transactions with their clients. See *In re Silverman,* 113 *N.J.* 193, 214, 549 *A.*2d 1225 (1988); *In re Reiss,* 101 *N.J.* 475, 486, 502 *A.*2d 560 (1986). In *In re Wolk,* 82 *N.J.* 326, 333, 413 *A.*2d 317 (1980), we stated:

When a lawyer has a personal economic stake in a business transaction, he must see to it that the client understands that the attorney's objectivity and ability to give the client undivided loyalty may be affected.

As managing agent of the Bartholdi property, purchaser of the Bartholdi property, and later as lender to his client, Humen was engaged in numerous sensitive business transactions with his client in which his interests were directly in conflict with those of his client (purchaser v. seller, lender v. borrower). When there are business transactions between lawyer and client, where the two have differing interests and the client relies on the attorney to exercise good judgment for the client, it is incumbent on an attorney "to make full disclosures concerning all aspects of the transaction." *In re Silverman, supra,* 113 *N.J.* at 215, 549 *A.*2d 1225.

Respondent's misconduct was not limited to a single aberrant act. Nor was he a young, inexperienced attorney. Respondent's unethical conduct continued over an eight-year period,

and although the conduct involved only one client, the ethical transgressions were many.

Respondent knew that Mrs. O'Connell, a widow, relied substantially on him for all legal and financial matters. She trusted him. It is that reliance and trust that "triggers the need for the rule's prescriptions of full disclosure and informed consent." *In re Silverman, supra,* 113 *N.J.* at 214, 549 *A.*2d 1225. None are more needful of confidence in an attorney than "the bereaved and dependent beneficiaries of an estate." *In re Kelly,* 120 *N.J.* 679, 689, 577 *A.*2d 497 (1990). Like the respondent in *Kelly,* Humen was not only Mrs. O'Connell's attorney but her friend and confidant. He abused both positions by his misleading and deceitful actions with respect to the Bartholdi property and his secret loan.

It is also well established that an attorney should refrain from engaging in a business transaction with a client who has not obtained independent legal advice on the matter. *In re Barrett,* 88 *N.J.* 450, 453, 443 *A.*2d 678 (1982). The reasoning for that proscription is obvious—the attorney's judgment can be impaired by self-interest. In such a situation, a lawyer has a duty to explain carefully, clearly, and cogently why independent advice is needed. *In re Reiss, supra,* 101 *N.J.* at 487, 502 *A.*2d 560; *see In re Smyzer,* 108 *N.J.* 47, 54–55, 527 *A.*2d 857 (1987) (attorney contemplating business transaction with client "must carefully explain ... the need for independent legal advice"); *In re Wolk, supra,* 82 *N.J.* at 334, 413 *A.*2d 317 (counsel "should have insisted" client retain independent counsel); *In re Hurd,* 69 *N.J.* 316, 330, 354 *A.*2d 78 (1976) (although no attorney-client relationship existed, counsel should have refused to go forward with transaction until client had obtained independent legal advice). Here, respondent always advised Mrs. O'Connell that he was representing her as her attorney. He never stated that he was merely acting as her business advisor or friend, nor did he ever advise her to seek independent counsel.

■ There remains the question of what discipline should be imposed. Disbarment seems unwarranted because, unlike Gerald Kelly in *In re Kelly, supra,* 120 *N.J.* at 687–90, 577 *A.*2d 497, respondent did not misappropriate his client's funds at least so far as his inadequate records disclose. In *In re Silverman, supra,* 113 *N.J.* at 225–28, 549 *A.*2d 1225, we imposed as discipline retroactive suspension for six years for misrepresentations, false statements under oath, and improper participation in a business transaction with an elderly client. We did not disbar the attorney because the fraudulent conduct was limited to a single, if long-term, transaction and because he harbored "a genuine belief that the venture would reap substantial reward" both for himself and his client. Because of that sincere belief, we found the case distinguishable from *In re Wolk, supra,* 82 *N.J.* 326, 413 *A.*2d 317, in which we disbarred an attorney who counseled his widowed client to make a hopeless investment in a building in which he had an interest and concealed vital information from her, including the fact of a foreclosure and sheriff's sale of the building.

Where an attorney involved in a conflict-of-interest situation has failed to recognize his obligation to his client, the discipline imposed has ranged from public reprimand to disbarment. See *In re Gavel, supra,* 22 *N.J.* at 262–67, 125 *A.*2d 696 (attorney disbarred for arranging transfer of four properties from client to attorney's wife, misrepresenting facts to bank to obtain mortgage, and selling the property within a year and never turning over proceeds to client); *In re Harris,* 115 *N.J.* 181, 183, 557 *A.*2d 657 (1989) (two-year reciprocal suspension for inducing one client to lend large sum to another client of whom respondent was a judgment-creditor, without informing first client of the financial difficulties of the borrowing client); *In re Reiss, supra,* 101 *N.J.* at 492, 502 *A.*2d 560 (attorney who exhibited gross disregard of conflicts of interests with his clients who also were his partners was given one-year suspension); *In re Loring,* 62 *N.J.* 336, 341–42, 301 *A.*2d 721 (1973) (public reprimand for, *inter alia,* conflict of interest in repre-

senting clients at closing while pressing adverse lien on his own behalf on the proceeds of sale); *In re Nichols*, 95 *N.J.* 126, 132, 469 *A.*2d 494 (1984) (public reprimand for involvement in purchase of client's home while continuing representation of the client in two matters, as well as for rental of property without authority from or notice to absent owners, and misrepresentation of ownership to the tenants).

Respondent's misconduct as found by the DEC and DRB is limited to one client—Mrs. O'Connell. Both respondent and the grievant failed to separate their personal relationship from their professional association. Surely Mrs. O'Connell had to realize that she was incurring legal fees for his services. Throughout this eight-year period Mrs. O'Connell called respondent at least weekly for legal or financial advice.

Nonetheless, respondent put his own self-interest above the interests of his client, to whom he owed unfettered loyalty. He misrepresented and deceived Mrs. O'Connell about his role with respect to the Bartholdi property and the mortgage. We conclude that a two-year suspension from the practice of law is an appropriate discipline.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

## ORDER

It is ORDERED that PETER L. HUMEN of JERSEY CITY, who was admitted to the bar of this State in 1977, is hereby suspended from the practice of law for two years, and until the further Order of the Court, effective March 15, 1991; and it is further

ORDERED that respondent shall be enjoined and restrained from practicing law during the period of his suspension and that he shall comply with Administrative Guideline No. 23 of

304

the Office of Attorney Ethics, which governs suspended attorneys; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate Administrative costs incurred in the prosecution of this matter.

*For suspension* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.