## IN THE MATTER OF CALVIN J. HURD, AN ATTORNEY AT LAW.

Argued June 12, 1975—Decided March 9, 1976.

*Mr. William R. Gilson* argued the cause for the Union County Ethics Committee.

*Mr. Calvin J. Hurd* argued the cause *pro se.*

PER CURIAM. After a hearing on various charges preferred by the Union County Ethics Committee, respondent, Calvin J. Hurd, was found by that Committee to have violated DR 1–102(A)(4), prohibiting "conduct involving dishonesty, fraud, deceit or misrepresentation," and DR 9–101, which

requires an attorney to avoid "even the appearance of impropriety."[1] A presentment having been filed with this Court, we issued an Order to Show Cause why respondent should not be disbarred or otherwise disciplined.

The presentment grows out of respondent's role in a transaction concerning certain residential property in Elizabeth owned by one Ethel Skinner, which resulted in Mrs. Skinner's unwitting and unintended conveyance of her property to Ruth Hurd Minor, respondent's sister, on May 7, 1971. The Committee concluded that inasmuch as the transaction should have involved at most a loan, and not a sale or conveyance, Mrs. Skinner and her daughter, Frieda Skinner Randolph, had been the victims of respondent's fraud and misrepresentation.

## I

Of surpassing importance to an understanding of today's decision is an appreciation of the relationship between respondent and the Skinner family, particularly Ethel Skinner, a lady more than eighty years of age. The Hurds and the Skinners had been close neighbors on Rector Street in Elizabeth. Mrs. Skinner had occupied the same three family

---

[1] While the charges in question are framed under the Disciplinary Rules of the Code of Professional Responsibility, which became effective in New Jersey on September 13, 1971, and the conduct which brings respondent before us occurred prior thereto, nevertheless the Canons of Professional Ethics then in force were sufficiently broad to encompass the accusations made here. See, in addition to the Preamble ("[T]he enumeration of particular duties should not be construed as a denial of the existence of others equally imperative, though not specifically mentioned."), Canon 29 ("The lawyer * * * should strive at all times to uphold the honor and to maintain the dignity of the profession * * *.") and Canon 32 ("[A] lawyer will find his highest honor in a deserved reputation for fidelity to private trust and to public duty, as an honest man * * *."). Respondent in his brief concedes that the fact that the Canons, rather than the Disciplinary Rules, were in effect at the time of the acts complained of "does not appear to affect the determination of this cause."

home, which she shared with various relatives, for more than fifty-seven years. She knew all the Hurd children, including respondent and his sister, Ruth Hurd Minor, both of whom had moved from the Rector Street home prior to the events in question. Mrs. Minor furnished significant insight into the bond between the families when she told the Committee "* * * I know my mother was always in sort of an advisory capacity [to the Skinners], and I think this is what they thought of the Hurds, as something like that." While Mrs. Skinner had never consulted respondent in any legal matters, and the Committee quite properly concluded that an attorney-client relationship as such did not exist between them in this transaction, Calvin Hurd was the only lawyer Ethel Skinner knew. She said she "always trusted Calvin, * * * never had any reason not to, * * *" and would "trust him with [her] life."

Frieda Skinner Randolph, who with the children of her deceased daughter also occupied the premises in question, worked as a domestic for Mrs. Minor and cleaned respondent's office during the times pertinent hereto. From time to time she asked respondent for "bits of advice on one subject or another," which he readily furnished. Hence it was natural for the Skinners to turn to respondent for help when confronted with difficulties regarding the Rector Street property, and it is in the context of the existing relationship between the people involved that we appraise Hurd's conduct.

## II

In 1970 Mrs. Skinner was without funds to pay the water charges and real property taxes on her dwelling. Consequently, the City of Elizabeth purchased the property for taxes in September, 1970. The City apparently elected not to take immediate possession as permitted by *N. J. S. A.* 54:5–53.1; therefore Mrs. Skinner had a right to redeem the property within two years from the date of sale under the then ap-

plicable law, *N. J. S. A.* 54:5–54, or within such extended period as provided for under *N. J. S. A.* 54:5–77.

The Skinners sought respondent's assistance in obtaining information on how to prevent the loss of the property.[2] Hurd determined the amount ($1701.43 as of February 8, 1971) which would be required to redeem and informed the Skinners thereof early in 1971, whereupon Frieda Skinner Randolph sought on behalf of her mother to borrow the necessary funds from respondent. He told Mrs. Randolph he could not lend Mrs. Skinner the money but, according to his memorandum submitted to the Committee, he "suggested to her that she take every step she could to try to obtain the money from her family or possibly her principal employer (she performed residential domestic services almost daily)."

As we have observed, among those for whom Mrs. Randolph performed such services was respondent's sister, Ruth Hurd Minor. The latter was successfully importuned to loan Mrs. Skinner about $2000 (a sum which Mrs. Minor in turn borrowed from her daughter's trust account), and respondent was informed of the loan shortly before the date of the transaction in question. He also acquired from the Skinners a deed containing a description of the premises. The exact nature of the interest in the premises which Mrs. Minor was to acquire forms the basis of the present dispute.

We pause at this point to make note of another significant circumstance. The Committee found that when respondent was approached by the Skinners with their problem, the "final steps" were being put in motion by the Elizabeth Board of Education to acquire properties on Rector Street, including the Skinner home, as part of the site for a new high school. While there is disagreement about the extent of com-

---

[2]While it is of no special moment, the record is unclear as to whether the initial approach to respondent came by way of a letter from Ethel Skinner or through inquiry by Frieda Skinner Randolph while she was working at respondent's law office.

mon knowledge as to when precisely the properties were to be condemned, everyone involved was aware that at some point the Board was going to take many parcels of land in the area, including 144 Rector Street. Mrs. Minor testified that she and the Skinners were aware before May 7, 1971 that the Board was interested in acquiring the subject property, perhaps even by December of that year. So far had the plans progressed that during April, 1971, just weeks before the transaction which occupies our attention, members of the Skinner household, including Ethel Skinner and Frieda Skinner Randolph, were interviewed by the staff of the local redevelopment agency as part of the Workable Relocation Assistance Program (WRAP) submitted to the Department of Community Affairs. While there is nothing to indicate that respondent learned of this development, nevertheless (as the Committee concluded) he could have come by this most important information with little effort.

III

On May 7, 1971, Ethel Skinner, Frieda Skinner Randolph, and Ruth Hurd Minor assembled in Calvin Hurd's office. The necessary documents to effect a conveyance of the premises to Mrs. Minor for the amount of taxes and water rent due (a figure which bore no relationship to the property's true value of about $11,500) had either already been prepared or were in the process of preparation, as was the case with a contemporaneous agreement. By paragraph three of this latter instrument Ethel Skinner could compel reconveyance of the premises by repaying Mrs. Minor, within one year from the date of closing, the amount required to discharge the tax and water liens plus "any and all sums of money which purchaser may have expended upon the said premises for its maintenance upkeep and for payment of any and all tax and other obligations against the property," with seven per cent interest. Thereafter appeared the following:

4. That in the event at any time within one year of the date hereof the possession of the premises at 144 Rector Street, Elizabeth, New Jersey shall be taken by eminent domain by any governmental authority or agency of any kind, the provisions of the preceding paragraph shall be null and void and of no force or effect.

This was followed by a provision requiring Mrs. Skinner to pay $100 per month rent, upon default in any payment of which the right to reacquire the property would become "null and void, and of no force or effect."

The Committee's paramount interest was in determining how these provisions — particularly paragraph four which served at once to destroy Mrs. Skinner's right to compel reconveyance and to deprive her of the fruits of any condemnation within one year — found their way into the agreement. Respondent's position is that his instructions from his sister, whom he represented, and from Frieda Skinner Randolph contemplated those provisions. As might be expected in an after-the-event reconstruction, the testimony before the Committee was not entirely consistent either with respect to what the parties in fact intended or what they told respondent they intended. In addition, we note that not only Mrs. Minor but, more importantly (if less understandably), Mrs. Skinner and Mrs. Randolph, exhibited not the slightest animosity toward Hurd.

Mrs. Minor was distressingly ambivalent on many significant issues, but she did testify that she viewed the arrangement as constituting simply a loan, the purpose of which was to permit the Skinners to pay what they owed to the City and thus retain the property until the Board of Education took it, and that she so informed respondent.

In some respects Frieda Skinner Randolph likewise vacillated in relating to the Committee her version of what was intended and what respondent was told; but she too denied that a sale of the property was contemplated, as revealed by the following from her testimony:

Q. When you spoke to Mrs. Minor and explained to her that the City was foreclosing the taxes, did you ask her if she would loan the money to your mother?
A. Yes, I did.
Q. Did you ever have any conversation about selling the property to her?
A. No.
Q. Now, when you got down to Mr. Hurd's office on May 7, 1971, when you were all there together, did you realize that your mother was signing a deed to Mrs. Minor?
A. No, I didn't.
Q. What did you think she was signing?
A. I figured it was the paper that you have to sign when you make a loan.
Q. Like a mortgage, for example?
A. Right.

*　　*　　*　　*　　*　　*　　*　　*

Q. Since you believed that Mrs. Minor was lending your mother the money, what did you understand was her relationship to the property of your house, your mother's house, 144 Rector Street? Was she the owner of it or did she hold it?
A. No, I figured she was the mortgage person.
Q. She held it as security?
A. Right. Like a mortgage.

Mrs. Skinner's testimony suffers little from any stamp of uncertainty. Clearly she conceived of the purpose of the transaction as being to provide her with about $2000 in the form of a loan from Mrs. Minor, to be paid back within one year out of funds she hoped to realize from the imminent condemnation of her property. Mrs. Minor was to have a security interest in the premises during that time and was to incur all operating expenses, including taxes, insurance, and maintenance, the amounts for which were to be added to the indebtedness and paid out of the condemnation proceeds. Whatever rent Mrs. Skinner paid was to be credited against her indebtedness to Mrs. Minor. If the property were not condemned within the one year, then Mrs. Skinner hoped to repay the loan by borrowing from some other source. She insisted she never intended to sell her property, whose value she did not know. Significantly, she did not realize even as of the date of the hearing that she had executed a deed, until that document bearing her signature was shown to her

in the course of the proceedings. And then she speculated that the word "Deed" on whatever instrument she signed must have been concealed from her by the pages being folded over. Mrs. Skinner recalled respondent explaining that she was transferring the property to Mrs. Minor but did not remember his saying "deed." Nor did she recall him telling her — as he maintains — that she should have her own attorney.

Respondent contends that he discussed with the Skinners all the terms of the agreement and the consequences of the transaction, that they indicated their understanding, and that they expressed their relief at being "free of the responsibility of the house." As to the latter, Mrs. Randolph asserted specifically that neither she nor her mother said this. It is perfectly apparent that whatever explanation of the May 7 agreement respondent may have given to the parties, the Skinners were left entirely unaware of its true effect, and, as the Presentment avers, "[i]f Mrs. Minor understood the import of paragraph 4 of the agreement, she completely ignored it and testified repeatedly that she considered her advance of money to Mrs. Skinner to be a loan." (At this point it is probably worth observing that while the Skinners were obviously unlettered and uninformed in business matters, Mrs. Minor, a school principal, was not uncomfortable with words and figures.) This is clear and convincing evidence to support the Committee's finding that the parties intended a loan and not a conveyance.

The balance due the City of Elizabeth as of May 7, 1971 for taxes and unpaid water charges was $1860.48. The consideration for the conveyance to Ruth Hurd Minor, including attorney's fees and transfer tax, was $2147.98. On May 13, 1971, just six days later, the Board of Education formally retained counsel to undertake the acquisition of 76 parcels of land including 144 Rector Street. Shortly thereafter, in June or July (the appropriate letters to property owners were dated June 10, 1971, but apparently were not sent immediately), the Elizabeth Board of Education moved to

acquire the property, offering the new owner, Mrs. Minor, the appraised value of $11,500. It does not appear that at this point anything was done to correct or even address what should have appeared to Mrs. Minor to be a perplexing inconsistency: if she believed she had participated only in a loan not involving any conveyance of property, why then was she being treated as the record owner of the property to whom an offer to purchase was being made?

Nor does it appear that respondent — who again was representing his sister, this time in the condemnation proceedings — felt any urging to remind Mrs. Skinner of her precarious position under the terms of paragraph four of the agreement, extinguishing her right (granted under paragraph three) to compel reconveyance. Hurd's perception of his role in this entire transaction is perhaps best illuminated by his testimony following an inquiry as to what he did after learning of the Board's offer to acquire his sister's property:

Q. At that time you were aware of the provisions of the agreement [of May 7, 1971], which is in evidence as Exhibit P–5?
A. Yes.
Q. Did you feel at that time that there was any duty upon you to call to the attention of Mrs. Skinner the fact that there was a possibility that she would lose her right of redemption under the agreement that you prepared?
A. No, this was intended to be self-executing, that particular clause with respect to the eventuality of any condemnation proceedings. I forget whether it's Paragraph 3 or Paragraph 4.
Q. Four, Paragraph 4, which provides that in the event that at any time within one year of the date of the agreement the property was taken by eminent domain the provision of the preceding paragraph, which was the redemption provisions, would be null and void and of no force and effect.
Now, you say that was to be self —
A. (Interrupting) That was intended to be self-executing yes.
Q. I don't quite know what that means, Mr. Hurd, What do you mean?
A. No notice would be required.
Q. No notice would be required?
A. Yes.
Q. Was it your impression, when you drew Exhibit P–5, that this was strictly a loan by your sister to the Skinners?
A. No.

Q. That was not your impression?
A. No, it was not. As I indicated in my Memorandum, when Frieda had called me — Frieda ˙Skinner Randolph had called me, she indicated that Ruth was taking over the property. Of course, taking over the property is a lay term. I remember asking Frieda, "Is this to be a transfer," or words to that effect, and she said, "Yes."

And when she mentioned that it was to be for taxes and water, I raised the question immediately with her as to the fact that whether — that the property probably was of a higher value than the amount of the taxes and the water. She said she knew that and she made the statement that I've indicated in my Memorandum about they're going to lose it any way and they would just as soon see Ruth get it.

Q. Well, Mrs. Minor has testified that at no time was she intending to purchase the property.
A. Yes.
Q. But merely to make a loan to these people, and at such time as the loan was repaid, the property would either be returned and that she was not going to rely on the one year set forth in the agreement.
A. That's what she said.
Q. You maintain that you represented your sister in this matter?
A. Yes.
Q. From whom did you get the information to prepare the agreement?
A. From my sister and from Frieda, both. Basically from my sister because I asked her what the nature of this transaction was. Frieda told me she wanted to take over the property and that it was to be a deed, and while I don't recall her exact response, anyway it was basically in approbation in what Frieda had said.

It was then my thought that there ought to be something about recapture or whether they wanted that or not or whether this was part of the understanding. I mentioned this to Frieda, and as I recall, when Frieda initially called me, and she said something to the effect, "If you think it should be in there, put it in."

Q. Did your sister tell you that she was lending the money to Mrs. Skinner?
A. No, she said she was giving the money to them, but again I didn't consider "giving" as a gift as such, either.
Q. But did you consider that it was a loan?
A. No, no.
Q. You considered it was a sale and purchase?
A. Yes, a sale subject to recapture, I would suppose. I didn't know, but I would suppose that's why they considered or talked in terms of loan, because there was a right of recapture in there as distinguished from what we lawyers know as a complete conveyance.
Q. Well, your sister understood it to be a loan.
A. ˙So she says.
Q. Well, I can only go by what she says.
A. So can I.

Q. And I'm curious as to how this transaction took its form. If your sister was intending to make a loan, why it wasn't a mortgage rather than a deed.

A. Well, it was to be a deed, because this is what my understanding of what it was as to what both parties had stated.

Q. You at no time felt that you were representing Mrs. Skinner or her daughter in this transaction?

A. At no time.

Q. And you say you advised her to get another attorney or to be represented by Counsel?

A. Yes, I did.

Q. You had known Mrs. Skinner, for, I guess, all your life, practically.

A. Since I was a child.

Q. And did you feel that her interests in this particular transaction required some protection, legal protection.

A. Yes, that's why I advised her. That's why I was also careful to point out to her that the value of the property was probably in excess of what had been paid for it.

Q. Well, you knew as a matter of fact that it was, it wasn't probably, it was actually so, wasn't it?

A. The house was a very relatively run-down house, and as you can see from those appraisals that were gotten and the appraisal made by the City of Elizabeth, which I think was for $11,500. The appraisal which I subsequently got from Alton VanHorn on behalf of Mrs. Minor, which indicated the value of $12,000, and it was on the basis of those differences that a price was negotiated of $11,845, as I recall.

Q. So there was no question in your mind that some $1,700 or $1,800 nowhere near represented the value of the property?

A. No doubt about it.

Hence Mrs. Minor, represented by respondent, was able to convey the property in question to the Board on January 21, 1972, for $11,845.40, or almost $9700 more than she had paid for it about eight months before. As to this apparent windfall Mrs. Minor testified that any money over and above the loan and expenses of maintaining the property belonged to Mrs. Skinner. She said she discussed the matter with Frieda Skinner Randolph and "* * * I told her I had it in escrow, whatever that means, it sounded like a good word, but I think it means that you put it aside and you don't use it." While the balance has not yet been turned over to Mrs. Skinner, Mrs. Minor readily acknowledged the indebtedness.

On September 12, 1974, Mrs. Minor withdrew $5000 from her bank account and gave $3000 to the Skinners to help them in their relocation from 144 Rector Street. Their relocation problems had occasioned their seeking assistance from the Union County Legal Services Corporation, which in turn caused the entire matter to be investigated by the Ethics Committee. The latter's Statement of Charges in Lieu of Complaint preceded by one day Mrs. Minor's withdrawal of the funds part of which went to assist the Skinners.

## IV

In addition to those findings of fact to which we have already referred the Committee made the following determinations:

At the time of the meeting in Respondent's office on May 7, 1971, Mrs. Skinner and her daughter Mrs. Randolph had already been contacted by the WRAP representatives with respect to relocation. A simple phone call by Respondent, who has practiced law within the City of Elizabeth since the date of his admission to practice, would have confirmed the imminent taking of the property by the Board of Education. The fact that the City had chosen not to exercise its right to immediate possession could also have been confirmed by a phone call or brief letter. The Respondent was thus in a position to immediately obtain such information concerning the status of the property and then in turn to advise Mrs. Skinner and her daughter that there was no need to convey and transfer the property to his sister Mrs. Minor for the amount of back taxes and water charges.

\*        \*        \*        \*        \*        \*        \*        \*

The Skinners were not represented by an attorney at the closing or at any time thereafter. They knew and relied upon Respondent and trusted him. If they had secured a loan from another source and they required the services of an attorney, they would have asked him to represent them.

\*        \*        \*        \*        \*        \*        \*        \*

The documents signed by Ethel Skinner should have been a bond and mortgage, not a deed or conveyance.

\*        \*        \*        \*        \*        \*        \*        \*

There was no need for even such a loan inasmuch as the Skinners could have closed with the Board of Education for at least $11,500.00 at any time after June 10, 1971, if not before.

\*        \*        \*        \*        \*        \*        \*        \*

The Agreement drafted by Respondent was not in accordance with the understanding of the parties.

\*      \*      \*      \*      \*      \*      \*      \*

The Agreement drafted by Respondent was unconscionable in that it provided for a conveyance of the property for insufficient consideration and provided that at the very time funds became available with which to repay the funds advanced, the right of redemption or re-purchase or re-conveyance of the property was lost.

Our review of the record satisfies us that the Committee's findings and conclusions are amply supported by clear and convincing evidence. We have dwelt on the relationship between the parties to emphasize the magnitude of Mrs. Skinner's reliance upon Hurd and her faith and trust in him. It is from that unusually close relationship that respondent's duty grew. Under the circumstances before us his conduct did not measure up to his obligation as an attorney.

Particularly glaring is the preparation and inclusion of paragraph 4 in the agreement, which the Committee properly characterized as "unconscionable." It originated with the respondent; its presence is without redeeming virtue in terms of the conveyor's interest; and its effect on the Skinners could only be devastating.

Respondent contends he advised Mrs. Skinner to seek independent counsel. In the context of this case (and irrespective of what might be the responsibility in either a more "arm's length" situation or one in which an attorney undertakes to represent both parties to a real estate transfer, see *In re Kamp*, 40 *N. J.* 588 (1963); *In re Lanza*, 65 *N. J.* 347, (1974); and *cf. Schaller v. Schaller*, 44 *U. S. L. W.* 2353 (N. Y. Sup. Ct. Feb. 10, 1976)) it was his obligation to do more than simply counsel that course of action. Assuming respondent's position that Mrs. Skinner wanted to divest herself of her sole asset of any value for less than one fifth of its worth, and again recognizing her reliance on Hurd to protect her interests, then quite plainly respondent should have refused to go forward until such independent legal advice had in fact been obtained. In continuing with the trans-

action of May 7, 1971, he ran afoul of DR 9–101 entitled "Avoiding Even the Appearance of Impropriety." We are not confined, as respondent suggests to the specific examples set forth in the Rule; it is "all-inclusive," *In re Lanza, supra,* 65 *N. J.* at 354 (dissenting opinion of Pashman, J.), and is assuredly broad enough to encompass respondent's dereliction. See note 1, *supra;* and *cf. In re Cipriano,* 68 *N. J.* 398, 403 (1975).

Twenty years ago this Court recognized that "[i]n addition to the duties and obligations of an attorney to his client, he is responsible to the courts, to the profession of the law, and to the public * * *. He is bound even in the absence of the attorney-client relation to a more rigid standard of conduct than required of laymen." *In re Gavel,* 22 *N. J.* 248, 265 (1956). We there specifically reapproved the proposition that the fiduciary obligation of a lawyer applies to persons who, although not strictly clients, he has or should have reason to believe rely on him, *id.,* quoting from *Drinker, Legal Ethics* (1953), p. 92.

Mrs. Skinner relied on this respondent. In consequence thereof she was deprived of her property and of the opportunity to benefit from condemnation proceedings concerning the same. No extended analysis is required to equate the Committee's findings with a violation of DR 1–102(A)(4) nor with respondent's failure to abide by the high standards of conduct demanded of an attorney.

V

We turn to the question of punishment. The serious misconduct here is the only blot on an otherwise impeccable record of twenty-two years of legal service. Respondent presents a background of scholastic achievement; public service as an assistant prosecutor, trustee of the Union County Legal Services Corporation, President of the New Jersey State Board of Education and officer of the National Association of

State Boards of Education; civic and professional memberships; and a variety of community service and awards.

The instant transgression is obviously an aberration warranting a lesser penalty than would otherwise be appropriate were it not for this respondent's long and distinguished history of public and professional service. In these circumstances the proper measure of discipline is three months' suspension from the practice of law. So ordered.

We are informed that the necessary steps have been taken to assure an accounting and payment of the monies due Mrs. Skinner, including a crediting to her of the amount paid for "rent." As part of today's decision we order the Union County Ethics Committee to monitor those proceedings and report to this Court upon the completion thereof. For that limited purpose we retain jurisdiction.

*For suspension for three months*—Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—6.

*Opposed*—None.

## ORDER

It is ORDERED that Calvin J. Hurd of Elizabeth be suspended from the practice of law for three months and until further order of the Court, effective March 22, 1976; and it is further

ORDERED that the Union County Ethics Committee report to this Court as to the accomplishment of payment of all monies due Mrs. Ethel Skinner, including the crediting to her of the amount paid for "rent"; and it is further

ORDERED that jurisdiction be retained for the limited purpose set forth above; and it is further

ORDERED that Calvin J. Hurd be and hereby is restrained and enjoined from practicing law during the period of his suspension.