614 A.2d 1344
IN THE MATTER OF ROBERT F. DATO,
AN ATTORNEY AT LAW.

November 4, 1992.

## ORDER

The Disciplinary Review Board having filed a report with the Court, recommending that ROBERT F. DATO of WOOD-BRIDGE, who was admitted to the bar of this State in 1965, be suspended for a period of one year for acting with a conflict of interest in his purchase of property from a client, and the Court having heard the arguments of the parties, and good cause appearing;

It is ORDERED that the report and recommendation of the Disciplinary Review Board are adopted and ROBERT F. DATO is hereby suspended for one year, effective November 23, 1992; and it is further

ORDERED that the report and recommendation of the Disciplinary Review Board are adopted and ROBERT F. DATO is hereby suspended for one year, effective November 23, 1992; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent shall be restrained and enjoined from practicing law during the period of his suspension and that he shall comply with Regulation 23 of the Administrative Guidelines Governing Suspended Attorneys; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.

## APPENDIX

### Decision and Recommendation of the Disciplinary Review Board

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter was before the Board on a hearing panel report recommending a private reprimand, which the Board determined to treat as a recommendation for public discipline.

Respondent was admitted to the New Jersey bar in 1965. He maintains a practice of law in Woodbridge, Middlesex County. In 1984, he was retained by Mary Cinque, a long-standing friend of respondent's wife and her family, to represent her in a divorce action against her husband, the grievant herein. She paid respondent an undisclosed sum as a retainer.[1] After a matrimonial action permeated with acrimony, a final judgment of divorce was entered late in 1984.

By way of equitable distribution, Mr. Cinque agreed to transfer to Mrs. Cinque his title in the former marital residence, a three-family house located in Port Reading, Woodbridge Township. Although no formal appraisals had been conducted during the divorce proceedings, the parties stipulated, for the

---

[1] Although there was no testimony about the amount of the retainer, counsel for respondent alludes to a $1,000 payment in his letter-brief of May 9, 1991.

purposes of equitable distribution, that the property had a net equity of $90,000. Two mortgages encumbered the property: a $7,000 first mortgage with Carteret Building Loan Association and a $10,000 second mortgage with Carteret Bank and Trust Company.

After the divorce, Mrs. Cinque moved to Arizona, where her daughters resided. She then asked respondent, who continued to represent her in the ongoing matrimonial post-judgment proceedings in New Jersey, to assist her in procuring a buyer for the Port Reading property. According to her testimony, although she left the sales price up to respondent, she hoped to sell it for $95,000.

In the spring of 1985, respondent offered to sell the property to another client, Ralph Mocci, a real estate developer he had known both socially and professionally since the early 1970s. Respondent had also been in partnership with Mocci in some business ventures. Mocci testified that, after he saw the property, he became very interested in purchasing it. His intention was to refurbish and then resell it. In Mocci's words, "... I told [respondent] when I passed by the house, we could possibly make money on the property and that I should go into contract" (T7/2/1990 16).

Consistent with this understanding, respondent prepared a contract of sale between Mrs. Cinque and Mocci, listing a purchase price of $95,000. The contract contained no provision for a mortgage contingency or for a brokers' commission. On April 15, 1988, respondent forwarded the contract to Arizona for Mrs. Cinque's review and signature (Exhibit P-8). He did not first obtain Mocci's signature thereon (Exhibit P-9).

Asked, at the DEC hearing, whether it was contemplated that he and respondent would become partners in the deal, Mocci replied that they had an understanding that respondent could choose to participate in any ventures in which he represented Mocci. Mocci added that "... in this particular case, it was the

same understanding that would apply with [respondent], that he would have the option. If he said he wanted to participate, I would give him the opportunity to participate. I don't think we ever discussed that. I don't even know if he was interested at the time. We really didn't discuss it. I can't say that he was or he wasn't" (T7/2/1990 20–21). Respondent vehemently denied that he had any interest in the property at that time.[2]

In any event, after Mrs. Cinque signed the contract and returned it to respondent, neither she nor Mocci heard anything further from respondent about the transaction. When queried at the DEC hearing, respondent offered no explanation for this puzzling turn of events. He replied that "... as best as I can remember, when I went to finalize the transaction, Mr. Mocci reconsidered" (T5/3/90 57). According to Mocci, however, respondent never presented the contract for his signature, although he had remained interested in the property at all times (T2/7/90 21). Throughout the contract phase of the transaction, respondent acted as the attorney for both Mrs. Cinque and Mocci.

Some months later, in September 1985, respondent decided that he would buy the property from Mrs. Cinque as an investment. He prepared a contract of sale listing a purchase price of $85,000, $10,000 less than the price that Mocci was willing to pay. As in the Mocci transaction, the contract did not contain a mortgage contingency clause or a provision for a real estate commission. The contract also stipulated that Mrs. Cinque would take back a second mortgage of $10,000 for one year, at twelve percent interest (Exhibit P–5).

In an attempt to justify his purchase of the property, respondent testified that Mrs. Cinque was having difficulty in selling it; that she was pressing him for help in selling the property,

---

[2] It is not known why respondent's—not Mocci's—name was typed below the line intended for the buyer's signature.

for which she was asking "less than $100,000"; that, after the deal with Mocci did not come to fruition, she continued to "press him for a buyer"; that it was then, for the first time, that he began to develop an interest in buying the property as an investment; and that, "knowing the area and having some roots there, I indicated to her that I would consider buying [it] and I told her that I thought the house in my opinion ... might have had a value of upwards of $100,000. That is, anywhere between $80,000 and $100,000. As I remember it, she had it on the market in that range; so I said to her that if I bought it in order to make it profitable to me and also to make it feasible for her that I would buy it with no conditions whatsoever, no mortgage contingency, no expressions of warranties" (T10/26/1989 16–17). Respondent went on to say that, because of the absence of a broker's commission, Mrs. Cinque would net $85,000, a sum equivalent to a sale for a $100,000 gross purchase price; that the property was "run down"; that the rental income of $800 to $900 monthly was too low and needed to be increased; and that, while this transaction was "in my good interest ... I was sure that this was good for her (T10/26/1989 22).

Asked by the hearing panel whether he had advised Mrs. Cinque to consult with an attorney, respondent replied:

If you permit me, the answer to that question is yes but it's a qualified yes and I have to put it on the record.

As I explained, Mary and my relationship was somewhat beyond attorney/client and for that reason we had formal and informal discussions. She was in Arizona. She was fighting vigorously for her rights relative to her divorce. Her husband had moved in with another woman with a longstanding marriage. Mary's in her 60's. So this was a marriage of 35, 40 years. Her children were siding with her husband and it was a very, very unpleasant situation from her point of view and from mine, knowing the family and knowing her as I did. When we got into this transaction, not only by virtue of her needing some advice concerning the sale but often I would say to her, Mary, you need an attorney in Arizona to enforce your rights. We'll go reciprocal which means that for the non-lawyer's [sic] that we would bring an action in the State of Arizona against her husband having—because she lived there and there would be a means by which she could enforce the support obligation under the terms of the divorce.

Mary did hire an Arizona attorney, I believe, because I went through the American Trial Lawyer's Association handbook and gave her names of lawyers, I remember this so clearly, in her area which I don't remember her area now, and when this was happening, this transaction, I cannot say to you under oath that I so very specifically told Mary you better get a lawyer on this sale, but there is no question in my mind that while this was happening I was advising Mary to be represented by Counsel in the context of this divorce and I do remember suggesting to her that at least have someone look at what's going on with this house to be sure you want to sell it. Be sure you want to sell it for whatever it is that I'm offering you and be certain you're doing the right thing. I can't say I added the last ingredient as that and be absolutely certain that the paperwork that I'm preparing is reviewed by a lawyer so that you know that it protects your interest, and the reason I say that [at] all, it was going to be as a deed, it was a cash deal. There was no—I wasn't concerned about her knowing the technical aspects being represented for the technical aspects of this transaction because it was just passing of money. I wanted to be sure she knew what she was doing in selling the house.

[T10/26/1989 20–22]

Respondent added that his partner represented him at the closing, while Mrs. Cinque "was unrepresented" (T10/26/1989 20).

Mrs. Cinque denied that respondent had made any suggestions that she have the contract reviewed by an attorney. She explained that she did not show the contract to another lawyer because respondent did not advise her to show it to another lawyer (T5/30/90 22).

It was respondent's estimation that $85,000 was a fair price for the property, in light of the numerous repairs that were needed and of the low rental income generated. Respondent testified that, even before the closing of title, he arranged for extensive repairs to be undertaken, necessitating a cash outlay of $1,000 to $1,500. In addition, respondent contended, he and his wife spent several weekends conducting repairs themselves. Respondent also asserted that, prior to the closing, he began efforts to increase the rents from $800–$900 a month to "$2,000 plus."

Respondent knew that the rental income could be readily increased. In his own words, "I knew the income potential of

the property from the moment I looked at it. In fact, I didn't even have to look at it. When Mary Cinque told me what the rents were, I said, Mary, you're not getting enough money there" (T10/26/1989 30). And then, "[my wife and I] thought it was a good investment because it was going to generate more income than it was going to cost us to carry it" (T10/26/1989 33).

At the DEC hearing, Mrs. Cinque was asked about the condition of the property at the time of the divorce. She denied that it was in a state of disrepair. She stated that the inside and outside were "nice" and that the portion of the property in which she had lived had been redone. In fact, she had visited the property on the day of the closing and had not observed any repairs, repainting or refurbishing. In her words, "everything looked the same" (T5/3/1990 39).

Following the signing of the contract, respondent forwarded $1,000 to Mrs. Cinque as a deposit, notwithstanding the fact that the contract provided for a $5,000 deposit. On October 18, 1985, the closing of title took place. As noted above, respondent was represented by his law partner; Mrs. Cinque went without legal representation.[3]

A review of the settlement statement (Exhibit P–6) shows that respondent obtained a $96,000 mortgage loan secured by a property that was being sold for $85,000. Respondent testified that he was able to secure a mortgage greater than the purchase price "by virtue of the cleaning up and repairs that were completed at that house, as well as the continuation of the rentals" (T7/2/1990 59).[4]

---

[3] The record is not clear as to whether Mrs. Cinque attended the closing. Respondent claimed she was not present, while she recalled that she was.

[4] If the bank—with which respondent admittedly had a very close relationship—gave him a mortgage loan equal to 113% of the purchase price, then

The RESPA also indicates that, at the closing, respondent received a $450 credit for the stove, a $500 credit for the refrigerator and a $1,000 credit for the furnace, for a total of $1,950 (exclusive of the alleged repairs).[5]

As mentioned above, the closing of title in the Cinque to Dato transaction occurred on October 18, 1985. Ten days later, respondent contracted to sell the property to three investors for $150,000, or $65,000 more than what he had paid Mrs. Cinque. This transaction, too, was exclusive of a broker's commission.

Respondent vigorously denied that he had contracted to sell the property to the investors before he bought it from Mrs. Cinque. He testified that, shortly after he bought the property from her, the investors retained him to review a contract of sale for the purchase of a three-family property in South Amboy for $150,000. Respondent recounted the sequence of events that developed as follows:

A. I advised them that I had this piece and suggested they take a look at it for the purpose of comparing the two and I told them that I could sell this place in Port Reading to them for less than the $150,000 they were going to pay in South Amboy. As they described to me the South Amboy and what I had done in the meantime with the Port Reading piece, I in my own mind, I knew that the piece in Port Reading was better of the two, because keep in mind, although, the closing is in October on my purchase, I had access to that house for almost two months before the closing and I did a lot of work and we'll get into that, I'm sure, on that Port Reading house prior to the date of closing. So I had renovated that house and I was convinced that—I keep using that word. I was comfortable in my telling them that this is a house they should look at and they did.

_____

obviously the bank's appraisal must have shown a much higher value for the property. Because banks typically lend eighty percent of the purchase price, the bank's appraisal must have reflected, at a minimum, a $120,000 value for the house.

[5] It appears that, subsequently, it was determined that the expense with the furnace amounted to $225 only. That would have reduced the credit in favor of respondent to $1,175 ($1,950 minus $225). Respondent supposedly returned the balance of the credit to Mrs. Cinque.

Q. Can you give us an idea of approximately how long after your purchase of the Cinque residence this took place?

A. We tried to locate in my diaries. It turns out that the 1985 diary was one that was the subject of an IRS partnership audit and it was used and no one in the office can now find it, but to my recollection—now, I don't recall. It would be foolish for me to tell you when I thought and this is four years later.

Q. So they went at some point in time and looked at the Danielle Street property?

A. As I remember, the next day they looked at it.

Q. Did you accompany them?

A. I remember meeting them at the site and showing them the exterior, father, son and a female. We did not go in the building at that time. They just wanted to get a feel for the neighborhood, what the house looked like.

Q. Then what happened?

A. Then they got back to me and expressed an interest.

Q. Did you go back to the house again?

A. Went back to the house and walked the house inside and out, and then within a day or two, they went back again without me and made their last inspection and then they came back to me and indicated an interest in buying, and as I remember, the figure was higher than I was asking for, more than $137,500. We ultimately got to $137,500.

Q. And a transaction was completed at the closing with the deed marked P–4, right?

A. That's correct.

[T10/26/1989 26–27]

The contract of sale between respondent, as seller, and Stephen Moore, Sr. and his wife, Stephen Moore, Jr., and Robert Moore, as buyers, listed a $150,000 purchase price. It also provided for a $13,750 deposit and a mortgage in the amount of $120,000, the latter to be obtained from Carteret Bank and Trust Company, as stipulated by the parties (Exhibit M–1).[6] For reasons that neither respondent nor the Moores can recall, on November 15, 1985, fifteen days before the closing of title, the parties executed an amendment to the contract, reducing

---

[6] This is the same bank that gave respondent a $96,000 mortgage loan when he purchased the property from Mrs. Cinque for $85,000.

the purchase price from $150,000 to $137,500 (Exhibit M–7).[7] Respondent's profit from the resale of the property, thus, totalled $52,500.

As in the transaction between respondent and Mrs. Cinque, the buyers were not represented by separate counsel. Respondent and the only investor who testified, Stephen Moore, Jr., agreed that the Moores had elected not to be represented by an attorney, notwithstanding respondent's advice, in writing, that they retain separate counsel. The record leaves no doubt, however, that the Moores expected respondent to render some legal services on their behalf. In fact, respondent's performance of certain legal services was more than a mere expectation on the Moores' part; it was a matter of express agreement between the parties. Specifically, it was agreed that respondent would assist the Moores in obtaining a mortgage, obtaining title insurance, and preparing the leases after the closing of title. As respondent testified, "... one of the considerations was that I was going to help them get their mortgage which I did and that I would assist them after the closing in terms of being certain that if they had to get leases drafted, I would do that for them, which I did" (T10/26/1989 35–36). And, as confirmed by Stephen Moore, Jr., it was the Moores' expectation that respondent would "deal with the bank and prepar[e] papers, obtain[ ] title insurance, [and] various other services," at no charge (T7/2/1990 48). Indeed, Moore testified that respondent handled the closing of title in the Moores' behalf (T7/2/1990 39).

Respondent testified that, immediately following his $52,500 windfall, he informed Mrs. Cinque of his good fortune. He

---

[7] It has not escaped the Board's attention that the mortgage loan obtained by the Moores, $120,000, coincidentally amounts to eighty percent of $150,000, the purchase price initially quoted on the contract. The Board also noted that the contract providing for a $150,000 purchase price listed a $13,750 deposit, or ten percent of the price ultimately paid by the Moores, $137,500.

testified further that he chose to "do certain things for her," instead of sharing his extraordinary profit with her. In this regard, the following colloquy took place at the DEC hearing between respondent and the presenter:

Q. Of course, during the course of this investigation in your dialogue back and forth and I want to make sure that this is clear, you've described certain fees in the matrimonial action that either were charged or do nothing which for some reason you forgave. Would you describe that for the record and we want to make sure that's clear?

A. This is the proverbial double-edged sword because I have generated almost $50,000 profit, gross profit on the sale of this piece within a very short period of time. Now, whether it be agreed or whether it be important thing or maybe it be good thing, I don't know. I did not choose to share the profit with Mary but I did indicate to her that by virtue of the fact that this was such a profitable transaction that I was going to do certain things for her. The first of which was that all legal fees relative to her suit for divorce would be borne by me. That is, she would not be charged any fees. Now, the file went on for two years after this. This was not the end of the road. There was more work done after the entry of the judgement including going to New York and Long Island and enforcing her rights in that Court, in the Superior Court of the State of New York that I indicated to her I would not bill her and I did not and my estimate conservatively at rates then of $125 and hour is that I performed at least $10,000 or $15,000 worth of work in terms of the hours that we spent together getting her what she was due in addition thereto because she had to come back from Arizona on at least four occasions to go to Court. I bought all of those expenses.

In addition thereto, Mary on occasion knowing that I felt morally obliged would knock on my door and say, Bob, I could use $1,000 and I could use $1,500 and I would give it to her to the tune of approximately $6,500 and finally, Mary, who is reasonably bright, here we are in the State of New York, in Long Island, Sussex County, finally get to meet her husband, ex-husband and there's an issue about two mausoleums which we claimed were in both names and which Mr. Cinque said was only in his name. This is irrelevant.

Mrs. Cinque said she thought they had a value of anywhere between $10,000 and $15,000. We had to wind up that case that day, and what I did, I said, I'll tell you what, Mary, I'm a gambler. Let's pretend we're in Atlantic City for a moment. You can't lose on this, Mary. If you're right and the mausoleums are in both your names, your husband has agreed to give you half which would be roughly $5,000 or $6,000. If you're wrong—no, I'm sorry. I apologize. I'm forgetting it precisely.

It turned out that her husband would give her $6,500 if he was right and $12,000 if he was wrong, meaning it was in both names. He claimed it was only in his name. I said to her, what I'll do for you because I don't want any more of this case, is that I will, out of my own pocket, give you the difference

if he's right and you're wrong. So you can't lose, Mary. Either you're going to get it from him or me. I think you're right. In fact, I called Beth Israel on the phone and they told me the deed was in both their names. I figured it was a gamble for me. It turns out I was wrong and the deed was only in his name and I gave Mary another four or five, whatever the number was. I said six. It may have been slightly less than that but she wound up with that, too, which is relevant or not but I wouldn't have done that if it wasn't for the fact I thought I owed her.

So between the no counsel fees, and the monies that I gave her, in my opinion, it was roughly $25,000 which was much better to her than one half of $50,000 because one half of $50,000 as you know is not $25,000 when you talk about net proceeds after taxes.

[T10/26/89 37–39]

Mrs. Cinque denied that respondent had informed her of the resale of the property to the Moores and of the huge profit he had realized therefrom. She testified that she found out about both approximately one year later through one of her daughters, who had been apprised of the events by Mr. Cinque. She denied that respondent had ever discussed the resale of the property directly with her. As she put it, she learned of it "from people in my neighborhood and my ex" (T5/30/90 31). At the time of this discovery, respondent was still her attorney in the post-divorce matrimonial proceedings.

At the conclusion of the DEC hearing, the panel found that there was no clear and convincing evidence that

"Mr. Dato used his position to take advantage of Mr. Mocci, Mrs. Cinque or the Moore family, and we tend to believe that he became a victim of Gaetano Cinque's malice and the substantial disparity in price between the purchase from Mrs. Cinque for $85,000 and the sale to Moore for $137,500. However, there is a clear pattern of an attorney who disregarded a conflict of interest between two of his clients, Mocci and Cinque, and then between himself and his clients in buying the house from Mrs. Cinque and selling it to the Moore family and, therefore, the Committee recommends that Robert Dato receive a private reprimand for violation of *RPC* 1.7 and *RPC* 1.8(a)."

[Hearing Panel Report at 10–11]

## CONCLUSION AND RECOMMENDATION

Upon a *de novo* review of the record, the Board is satisfied that the DEC's conclusion that respondent's conduct was uneth-

ical is fully supported by clear and convincing evidence. The Board cannot agree, however, with the DEC's recommendation that respondent receive only a private reprimand. In the Board's view, anything short of a suspension would be disproportionate to the ethics offenses and would not adequately vindicate the goals of the disciplinary system to maintain the integrity of the bar and the public's confidence in the profession.

This case is one more sorry example of an attorney's failure to heed the Court's repeated warnings about the dangers of entangling his or her business dealings with a professional relationship. *See In re Silverman,* 113 *N.J.* 193 [549 *A.*2d 1225] (1988); *In re Reiss,* 101 *N.J.* 475 [502 *A.*2d 560] (1988 [1986]); *In re Wolk,* 82 *N.J.* 326 [413 *A.*2d 317] (1980).

Respondent's conduct in this entire matter reflected a pattern of conflict of interest that started with his simultaneous representation of opposite sides in a transaction and ended with the overreaching of a client and friend of long-standing. Indeed, respondent embarked on one scheming course of conduct after another in order to promote his own interest, to the detriment of his clients.

It all began when respondent asked Mocci, a client, if he was interested in buying the former marital residence of another client, Mrs. Cinque, for a price fixed by respondent and known to him to be below the fair market value. Respondent did not counsel either client to consult with or retain an attorney of their own choosing. Thereafter, respondent prepared a contract of sale between Mocci and Mrs. Cinque and forwarded it to the latter for her signature. She signed it. For some reason that respondent could not explain and Mocci did not know, respondent never gave Mocci the contract for his signature, notwithstanding Mocci's continued interest in the property. Incredibly, some five months later, respondent drafted a contract of sale between Mrs. Cinque and himself, as buyer, this time listing the purchase price as $85,000, $10,000 less than

what Mocci had agreed to pay for the property. Once again, respondent failed to advise Mrs. Cinque to retain independent counsel. In fact, even if respondent had given Mrs. Cinque such advice, this precaution would not have been sufficient because of the special circumstances attendant to this case. In light of the parties' close, long-term personal and professional relationship, it is unlikely that Mrs. Cinque would have sought legal counsel. Instead, she would have continued to operate under the belief that respondent was protecting her interests because of the trust and faith that she placed on him. Under these circumstances, respondent's proper course of action should have been either to insist that Mrs. Cinque be represented by counsel or to refuse to proceed with the transaction. Egregiously, however, he was represented by his partner at closing, while she went without legal representation.

Respondent disavowed any improper motives on his part in purchasing the property from Mrs. Cinque. He insisted that $85,000 was a fair price because of the "run down" condition of the property and of the low rental income then collected; he contended that he had "renovated" the property and more than doubled the rents. He also pointed to the absence of a real estate broker's commission and of a mortgage contingency clause, in an attempt to justify the low purchase price. But respondent was unable to produce any proof of the repairs allegedly undertaken and Mrs. Cinque's credible testimony was that, on the closing date, the house looked the same as before. Also, if respondent knew that the rents were too low, then it is difficult to comprehend why he did not factor the real rental value into his computation of the property's fair market value. Moreover, the Cinque to Mocci transaction, too, did not contemplate a broker's commission or a mortgage contingency clause. In fact, the terms of the deal with respondent were less favorable to Mrs. Cinque than the terms of the deal with Mocci: Mrs. Cinque took back a $10,000 mortgage and allowed respondent to take credits of $1,950 at closing. A more egregious

case of overreaching a helpless client may not be easily envisioned.

Equally incredible was respondent's next course of conduct. A mere ten days after closing title on the property, respondent contracted to sell it to a group of investors for $150,000, or $65,000 more than what he had paid Mrs. Cinque. This transaction, as well, was exclusive of a broker's commission. For reasons not revealed by the record, the parties eventually agreed to reduce the purchase price to $137,500, thus causing respondent to pocket a handsome profit of $52,500.[8]

In his dealings with the Moores, too, respondent demonstrated total insensitivity toward the principles governing conflict of interest situations. The Moores first came to respondent as clients. Although there was testimony that respondent advised the Moores, in writing, to retain independent counsel and that the Moores declined, the inescapable truth is that the Moores expected that respondent would act as their attorney in the transaction. Indeed, Stephen Moore, Jr., testified that respondent handled the closing on their behalf.

In sum, respondent's overall conduct in this matter reflected an extreme indifference to his clients' interests and a pattern of self-dealing that is shocking to the minds of reasonable individuals. His behavior toward Mrs. Cinque was abominable. His testimony that he shared his ill-gotten gains with Mrs. Cinque by forbearing the payment of legal fees and expenses and by bestowing upon her certain material benefits is unworthy of belief. Although respondent professed that he acted with nothing but good intentions in his dealings with Mrs. Cinque,

---

[8] The logical negative inference flowing from this reduction is that the parties initially listed a price of $150,000 on the contract in order to obtain a higher mortgage for the buyers. The Board noted that, coincidentally, the mortgage loan granted to the Moores, $120,000, amounts to eighty percent of $150,000. The record, however, is insufficient to support a finding of impropriety in this regard.

the record leaves no doubt that his motivation was greed. Clear and convincing evidence of overreaching abounds.

There remains the question of appropriate discipline for respondent's serious offenses.

Where an attorney involved in a conflict of interest situation has failed to recognize his or her obligation to a client, the discipline imposed has ranged from a public reprimand to disbarment. In *In re Hughes*, 114 *N.J.* 612 (1989), the attorney was publicly reprimanded for extracting a $22,500 loan from a client with whom he shared an intimate personal relationship. The client was a divorced mother of three college-age sons and their sole source of support. The loan was designed to finance a business venture in which respondent had an interest. Respondent did not fully explain to the client the pitfalls of the representation and did not advise her to seek independent counsel. When the business became unable to repay the loan, the client was forced to file suit against the attorney and against his co-venturers, which suit was settled. After considering several compelling mitigating circumstances, including the age of the disciplinary matter, the Court determined that a public reprimand was sufficient discipline for respondent's conduct.

In another case, an attorney was suspended for three months for misconduct intended to benefit not himself, but his sister. The attorney and his family had been friendly with their neighbors, the Skinners, for many years. In fact, one of the Skinners, Frieda, worked as a domestic for the attorney's sister and also cleaned the attorney's office. When Frieda's mother, Ethel, a woman more than eighty years of age, found herself in danger of losing her house for failure to pay property taxes, the attorney's sister lent $2,000 to Ethel. Thereafter, the attorney prepared the necessary documents to transfer title to Ethel's house to his sister for the amount of the taxes and water due, notwithstanding the fact that the value of the house was $11,500. Ethel, Frieda and the attorney's sister all testi-

fied that they viewed the arrangement as a mere loan, not as a conveyance of title. Ethel testified that it had never been her intent to sell the property and that she had not realized that she had signed the deed transferring title to the attorney's sister. Additional serious acts of impropriety by the attorney followed. Taking into account numerous mitigating factors, the Court suspended the attorney for three months, noting that, but for the extensive mitigation, the discipline imposed would have been harsher. *In re Hurd*, 69 *N.J.* 316 [354 *A.*2d 78] (1976).

An attorney who prepared and signed a trust agreement with his housekeeper without advising her to retain separate counsel received a six-month suspension. *In re Gallop*, 85 *N.J.* 317 [426 *A.*2d 509] (1981). The agreement acknowledged receipt by the attorney, as trustee, of the deed to the housekeeper's real property. Upon expiration of certain conditions, the trustee was authorized to sell the property. After deducting all costs and expenses in connection with the title transfer, one-half of the net proceeds was to be paid to the trustee as "compensation for money advanced" to the housekeeper and legal services rendered. The trustee also had the option to retain title and pay one-half of the highest offer received. Ultimately, after the housekeeper died, the attorney decided to exercise the latter option. Once again, the attorney prepared an agreement whereby the housekeeper's son waived his right to possession of the property and agreed to sell it to the attorney. The agreement provided that, after payment of certain expenses, $5,000 was to go to the son, in trust. The son was not represented by counsel. The attorney never segregated the $5,000 that he was obligated to hold in trust for the housekeeper's son. Thereafter, the attorney sold the property to a third party. The Court noted, in mitigation, that the attorney had provided gratuitous legal services to the family over the years and that he had financially rectified the violation of his trust with the son.

In *In re Griffin*, 121 *N.J.* 245 [579 *A.*2d 815] (1990), the Court imposed a one-year suspension when an attorney persuaded his paramour, an alcoholic saddled with heavy debts, to obtain a $20,000 mortgage on her house to satisfy her financial obligations and to benefit the attorney. The attorney was to cosign the mortgage loan, to accept primary responsibility for its payment and to get life insurance in the amount of the loan, naming the paramour as beneficiary. The attorney did not advise the paramour to seek independent counsel. The paramour testified that she did not recall signing the mortgage documents because she had been "drinking for weeks." Several years later, the attorney stopped paying the loan. Ultimately, the paramour was forced to sell the house to avoid a foreclosure.

Recently, the Court reviewed the conduct of an attorney who created several serious conflict of interest situations by entangling his business concerns with those of his client, Lillian O'Connell, who was also a long-standing friend. *In re Humen*, 123 *N.J.* 289 [586 *A.*2d 237] (1991). There, the attorney advised O'Connell to purchase property owned by his friend for "tax purposes." The friend agreed to take back a $28,000 mortgage toward the purchase price of $44,000. After his friend expressed reservations about O'Connell's ability to pay the mortgage, the attorney drafted a rider to the contract of sale whereby the deed and mortgage would not be recorded for thirty months, thus allowing the friend to regain title without a foreclosure action, in the event of default. O'Connell was never informed of the rider. The deed and the mortgage were not recorded for six years. As to this transaction, the Court found that the attorney had engaged in a serious conflict of interest, by placing his friend's interests above those of his client. Subsequently, the attorney induced O'Connell to sell the property to him for $40,000, $14,000 less than its appraised value and $4,000 less than its original price. The attorney did not advise O'Connell to seek independent legal advice. After

the conveyance and the payoff of the $26,000 balance on the mortgage held by his friend, the attorney advised O'Connell that he would retain the balance of $14,000 to cover his fees and monies allegedly owed to him for payments on the property. O'Connell, thus, did not receive any monies from the sale of the house. The Court found that the attorney's purchase of the property had placed him in an incurable conflict of interest situation because the attorney was fully aware of O'Connell's reliance on his advice and of her lack of sophistication in business matters and, under those circumstances, he should have insisted that she obtain independent counsel. In yet another transaction, the attorney once again mixed his personal affairs with O'Connell's. When she expressed interest in purchasing a $93,000 house, the attorney assured her that he would find a mortgagee to lend her $40,000. Prior to the closing of title, the attorney informed O'Connell that he had obtained some investors who wished to remain anonymous. He then had her sign a mortgage listing the mortgagee as "Peter L. Humen, Receiver." The Court found that the attorney had engaged in a most egregious conflict of interest situation by acting deceitfully and by lending O'Connell $40,000 without disclosing to her that he was the mortgagee. Another serious impropriety was the attorney's failure to provide an accounting to O'Connell, as manager of one of her properties, for a period of five years and his misrepresentations to her that the property was operating at a loss. The Court suspended the attorney for two years, noting that his conduct had not been confined to a single, aberrant act and betrayed O'Connell's confidence and trust placed on him, as her friend, attorney and advisor.

Conduct by an attorney who submitted a false counsel fee affidavit to the court containing exaggerations as to the quantum and value of his services, at the expense of an eight-year old paralyzed boy, merited disbarment. *In re Wolk*, 82 *N.J.* 326 [413 *A*.2d 317] (1980). In another matter, the same attorney was retained by a widow as attorney for her husband's estate.

The attorney had also been named executor of the estate. Two months after her husband's death, the widow asked the attorney to suggest an appropriate investment for a portion of her inheritance. The attorney suggested that the widow invest $10,000 in a second mortgage on a multi-family dwelling owned by a company of which the attorney was a stockholder, president and counsel. The attorney testified that he had advised the widow to obtain separate legal counsel before making the loan. It is doubtless, however, that she relied solely on his legal representation. The attorney did not disclose to the widow that the mortgage would be subordinated to a new first mortgage on an unlimited amount, that the building had been purchased for $8,000 less than the mortgage amount of $10,000, and that the taxes were unpaid. Subsequently, the individual who held a $3,000 purchase money mortgage on the property instituted a foreclosure action. The attorney was served as registered agent for the owner/corporation and as agent for the widow, the second mortgagee. Notwithstanding, the attorney failed to notify her of the receipt of the summons and complaint and to defend the action in her behalf. A few months later, the widow asked the attorney why the mortgage payments had stopped. He assured her that they would soon resume. He did not mention the foreclosure action. Shortly thereafter, the widow retained new counsel, with whom the attorney spoke several times without informing him of the foreclosure proceeding. In disbarring the attorney, the Court warned that it would "no more tolerate the hoodwinking of helpless clients out of funds in a business venture that is essentially for the benefit of the lawyer than outright misappropriation of trust funds." (citations omitted). *Id.* at 335 [413 A.2d 317].

Respondent's conduct herein was similar to that displayed by the attorney in *Humen*, when the latter bought property from a client for $14,000 less than the appraised value. Humen's conduct, however, was not confined to that single improper act.

He also jeopardized his client's interests, in one transaction, by allowing a friend's interests to rise above those of his client; he retained $14,000 for the payment of unsubstantiated legal fees and expenses; he became a mortgagee in a transaction with the client, without disclosing that fact to her; he failed to provide the client with an accounting for a period of five years; and he made several misrepresentations to the client that the property that he was managing in her behalf was operating at a loss. The two-year suspension in that case was predicated on the fact that the attorney's conduct was not confined to a single, aberrant act but, instead, evidenced a pattern of overreaching.

Here, respondent overreached one client by a single act; there was no repetitive course of overreaching. Nevertheless, his behavior in this single episode with Mrs. Cinque was egregious. Coupled with his demonstrated indifference to basic conflict of interest considerations and to the well-being of his clients, his conduct is deserving of a lengthy term of suspension. There is, however, the remoteness in time of the transgressions to be considered. *In re Kotok*, 108 *N.J.* 314 [528 *A.*2d 1307] (1987). Almost seven years have elapsed since respondent's wrongs; no ethics complaints have been filed against him since that time. Accordingly, the Board unanimously recommends that respondent be suspended for a period of one year. One member did not participate.

The Board further recommends that respondent be required to reimburse the Ethics Financial Committee for administrative costs.

Dated: April 29, 1992